BROOKE WEITZMAN (SBN 301037)
e. bweitzman@eldrcenter.org
ANDREA SMITH (SBN 294163)
e. asmith@eldrcenter.org
**ELDER LAW AND DISABILITY RIGHTS CENTER**
1535 E. 17TH ST., STE. 110
Santa Ana, CA 92705
Telephone: 714-617-5353
Fax: (714) 754-1306

*Attorneys for Plaintiffs*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT COURT OF CALIFORNIA

| | |
|---|---|
| RIVERSIDE ALL OF US OR NONE, an unincorporated association; MELINDA FOBES, BRYAN YOST, MARILU PAEZ, SHAWN YOST, all as individuals and on behalf of similarly situated class representatives,<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>CITY OF RIVERSIDE, and LARRY V. GONZALEZ, in his official capacity as Chief of the Riverside Police Department<br><br>　　　　　Defendants. | **CASE NO:   23-cv-1536**<br><br>**CIVIL RIGHTS CLASS ACTION F.R.Civ.P. 23b(2) and (3)**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND INDIVIDUAL DAMAGES**<br><br>1.  42 U.S.C. § 1983: Eighth, Fifth and Fourteenth Amendments<br>2.  Americans with Disabilities Act (42 U.S.C. §§ 12101, *et seq.*);<br>3.  Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §§ 794, *et seq.*);<br>4.  Cal. Const. Article I, §§7,13; Cal. Civ. Code §52.1; Cal. Gov. Code §11135;<br>5.  Cal. Civil Code §2080 *et seq.* |

1

CAROL A. SOBEL (SBN 84483)
e. carolsobellaw@gmail.com
WESTON ROWLAND (SBN 327599)
**LAW OFFICE OF CAROL A. SOBEL**
e. rowland.weston@gmail.com
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
Telephone: 310 393 3055

**INTRODUCTION**

1.      The federal government mandates an annual assessment of the number of individuals experiencing homelessness in each government entity as a condition of receiving federal funding to address homelessness.[1] Point-in-Time Count and Housing Inventory Count - HUD Exchange.  According to the 2023 Point-in-Time Count ("PIT") conducted by Riverside County, an estimated 2441 individuals in the County are homeless within the definition of federal law.  Almost one-third of this total number is in the Defendant City of Riverside ("City").[2]  Exhibit 1, p.2.  Of the total number of 977 individuals in the City included in the 2023 count, more than 60 percent or 605 persons are without even nighttime shelter.  Ex. 1, p.4.

2.      From 2022 to 2023, the PIT Count documented an overall increase of the number of people experiencing homelessness.  In 2022, the City reported 514 unhoused persons in the PIT Count.[3] Ex. 2, p.5.  In the 2023 PIT Count, the number of unsheltered people in the City rose to 605, an increase of nearly 18 percent in just one year.  Ex. 1, p.4.  Significantly, the largest increases reported in the entire County were 31% in the number of unhoused military veterans and 27% in the number of transition age youth.  Ex. 1, p. 3.

3.      In the City of Riverside there are limited shelter spaces.  There are three facilities with approximately 90 shelter beds in total operated by private entities.

4.      At best, this would meet only approximately 15 percent of the need for shelter in the City. There are rarely empty beds at any of these three facilities.  Even if there were, these private shelters restrict admission to families and women with children, impose religious elements, ban Emotional Support Animals, or limit the

---

[1] Point-in-Time Count and Housing Inventory Count - HUD Exchange

[2] *See* 2023 Riverside County Homeless Point-in-Time Count Summary, attached at Exhibit 1.

[3] Exhibit 2, "City of Riverside Homelessness Action Plan," adopted October 11, 2022; on the City's website at: Office of Homeless Solutions | riversideca.gov

amount of time persons may stay there.  Perhaps most significantly, all are only open for nighttime sleeping.  So, during the day, when the City's enforcement efforts are at their maximum, Plaintiffs would have no place to be other than the parks and River bottom.

5.     Although the City was aware of the crisis facing unhoused and marginally housed individuals for years, they have failed to address the situation adequately.  While the City has published reports full of promises, most of its goals remain unfulfilled.  In October 2022, the Defendant City adopted a "Homelessness Action Plan."  Exhibit 2.  As part of the Homelessness Action Plan, the City announced that the Wildlands Public Safety and Engagement Team would focus on the Santa Ana River bottom (SAR).  Specifically, the Wildlands Public Safety and Engagement Team was to follow a monthly calendar with focus on "hotspot" areas. At those locations, the Team would offer services to people experiencing homelessness.  *Id.* at p. 12.  Included in the tasks of the Team would be to tag items for debris and trash abatement, provide enforcement as appropriate and enforce the anti-camping ordinance to ensure safety for all.  *Id.*

6.     Just a few weeks later, the City enacted new ordinances banning camping along the Santa Ana River bottom on November 4, 2022.  To date, unhoused persons in the SAR bottom and in parks throughout the City – and outside the Wildlands zone – have had little results from the promised outreach and near total, and in many instances total, destruction of their property.  Despite the lofty language of the Homelessness Action Plan, the CITY's focus has been on enforcement of criminalization to unlawfully seize and destroy peoples' property, including what many courts have identified as essential items that are protected from destruction.  In many instances, the City arrested persons for having their property in public places, criminalizing their status as unhoused persons.  The City has not offered adequate notice, a meaningful opportunity for storage, or a post-seizure process to reclaim property. Instead, with no process at all, the City

summarily destroys items it seizes.

7.     The City has premised its actions on the need to address fire and flooding risks.  But everything that the City has done over the last several months has done nothing to address these concerns and everything to put the City's unhoused community at greater risk from exposure to the elements.

8.     The City promised it would assist members of the plaintiff class to become sheltered after the ban was enacted but, nearly a year later, the City has failed miserably in fulfilling this promise, whether intentionally or unintentionally. For some unhoused residents, they still have no place to call home after a year of working with outreach teams for the simple fact that there is no housing available. Some got temporary shelter only to be returned to the streets after a few months. Because most of the shelters were already full and few people vacate to move to permanent housing, very few residents of the SAR received housing and then only after years of being in the system.

## JURISDICTION AND VENUE

9.     This is an action for temporary, preliminary, and permanent injunctive relief as well as damages pursuant to 42 U.S.C. §1983, based upon the ongoing violation by defendants of the rights secured to the plaintiffs by the Fourth and Fourteenth Amendments to the United States Constitution, applicable to Defendants under the Fourteenth Amendment.  Plaintiffs seek this relief to enjoin defendants from enforcing Riverside Municipal Code (RMC) §9.04.610, which prohibits any person to camp or use camp paraphernalia, to sit, lie, or sleep; or to store, use, maintain, or place any bulky items or personal property in any location within the Wildland Urban Interface ("WUI").  Defendants have used the enforcement of this ordinance to unlawfully seize the plaintiff class's personal property and evict them from their temporary shelters under threat of arrest.  Defendants have engaged in the same conduct in other areas of the City, outside of the WUI.

10.     Plaintiffs have no way to avoid violating this law because they are

unhoused.  Many are disabled or suffer from medical conditions that are exacerbated by Defendant's actions.  Some require Emotional Support Animals but, in violation of the law, have been told that they must relinquish their animals as a condition of getting shelter or housing.  It also seeks to enjoin the unlawful policies regarding the seizure, disposal and storage of property of people who are unsheltered in the city of Riverside anywhere in the city.  In most cases there was no notice or inaccurate notice before seizure, and there was no notice after seizure.  As applied to these plaintiffs, these policies and practices are unconstitutional.

11.     This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §1331 (in that it arises under the Constitution of the United States); §1343(a)(3) (in that it is brought to redress deprivations, under color of state authority, of rights, privileges and immunities secured by the United States Constitution); and under (a)(4) (in that it seeks to secure equitable relief under an Act of Congress, specifically under 42 U.S.C. §1983) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

12.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) and (e) in that (1) the unlawful actions challenged herein occurred in the Central District of California.

**PARTIES**

**Plaintiffs**

**Riverside All of Us or None ("RAOUON")**

13.     Plaintiff Riverside All of Us or None Plaintiff Riverside All of Us or None ("RAOUON") is a grassroots organization that works on behalf of formerly incarcerated individuals to seek policy changes that support its constituency as well as supports the needs of Riverside residents who were formerly incarcerated or state-impacted.  RAOUON staff and volunteers conduct regular street outreach to find individuals who fall into these categories and connect them to the resources of

its parent organization, Starting Over Inc., as well as other social service organizations.

14.     Many individuals RAOUON seeks to help are unhoused after their release from a carceral situation. In addition, many people who are unsheltered have prior histories of incarceration, including criminalization resulting from the circumstances of being unhoused   As a result, RAOUON became involved in providing material resources to unhoused individuals impacted by property seizures, helping them navigate city systems and provide crisis counseling support.

15.     As a result of the City's actions, seizing and destroying the property of the class, RAOUON has had to expend increased time and money to assist those targeted by the challenged property seizures and replace essential items.  Over the last year, RAOUON has devoted approximately 50 hours a week of staff and volunteer time to provide materials resources to the unhoused population in Riverside, replace seized property, connect these individuals with other resources to assist with their losses, and provide crisis counseling.

16.     RAOUON has had to divert its staffs' and volunteers' time, as well as monetary resources to replace items wrongfully seized and destroyed by the City, from time and money it would otherwise spend on its core activities of mobilizing formerly incarcerated individuals to advocate for public policy change.

**Melinda Fobes**

17.     Melinda Fobes has been unhoused for three years and resided in the SAR in Defendant City at all relevant times to the actions complained of herein. . She has a disability that currently requires her to use a wheelchair.  Over the past two years, she worked with social workers in Riverside to obtain housing and only recently was successful.  Ms. Fobes was employed but did not earn enough to pay rent without assistance from public sources.

18.     Ms. Fobes had her property seized and destroyed on several occasions over the past year.  When she learned that there was going to be a camping ban in the area where she was staying, Ms. Fobes called the City to confirm the information and was informed that she did not have to worry about her property being taken unless she received notice from the city.  Ms. Fobes never received notice.  On or around August 2022, she left her property in the River bottom to go to work.  When she returned, all of her property was gone. She lost her tent, her clothes, her personal items including her birth certificate.  She received no notice as to how she could obtain her property and was informed by witnesses that Riverside Code Enforcement personnel had thrown her property into a dump truck.

19.     In the past, Ms. Fobes was taken to a shelter operated by Mercy House by City agents and employees, but the shelter would not accept her because of her disabilities.  She understood that the shelter did not have the capacity to accommodate a person with her disabilities.  She was taken to a hospital and ultimately released back to the streets without support and without a way to reclaim her essential property.

**Bryan Yost**

20.     Bryan Yost has been unhoused for the past two years.  His property has been seized and destroyed by the City multiple times.  In or around August 2022, he received a notice that said that property might be taken from the area.  Mr. Yost observed that the notice was marked as "pending," so he understood that there was not an immediate need to remove property until there was a designated date.  A few days later, Code Enforcement personnel arrived at his location in the SAR and told him he could only take whatever property he could carry and that the rest of his property would be put in a dumpster.  As he watched Code Enforcement, he observed his property thrown in the dumpster without being tagged or inventoried.  He received no information on how his property could be retrieved.   He learned

later that the dumpster had been looted so he could not retrieve even the property thrown in the dumpster by City employees and agents.

21.    In or around December 2022, Mr. Yost was again confronted by City Code Enforcement personnel when he was in a public place with his property.  At the time, Mr. Yost had all of his possessions in two boxes.  The City agents informed him that he could only retain one.  He lost irreplaceable family possessions, including his grandfather's 1942 Breitling watch.

**Marilu Paez**

22.    Marilu Paez has been unhoused for 12 years after she escaped from a domestic violence situation.  Her property was seized and destroyed by City employees and agents several times for having it in a public place.  Most recently, in early June 2023, she observed that a notice of removal had been placed near her belongings.  The notice stated that her property would be removed by city agents on or about June 7, 2023 because it was in the public right of way.  Ms. Paez believes that the notice was placed there by the City's agents from River Code Enforcement.  Ms. Paez packed her belongings , segregating what she wanted to place in storage so that she could direct the Code Enforcement agents which items were to be tagged for storage.  The agents arrived two days later while Ms. Paez was away from the location, prior to the date on the notice.  No notice was left behind with any post seizure procedures.  Ms. Paez is informed and believes that Code Enforcement seized all of her belongings and immediately threw them away.

23.    Ms. Paez lost essential items, including a tent, bedding, her state-issued identification, her EBT card and MediCal card.  To date, she has been unable to replace her identification or her medical card.  In addition, Ms. Paez lost all of her clothing except what she was wearing at the time.

24.    The City's agent informed Ms. Paez that she would be taken to a shelter at a church in Lake Elsinore where the shelter residents to participate were

required to be subjected to religious activities.  Ms. Paez objected to being subjected to religious requirements.  She was not offered any non-religious shelter option.  She was then told to work with Path of Life but the group has not done outreach to her and she has been unable to reach them on the telephone when she has available minutes to receive or make calls. Ms. Paez is still in the SAR.

**Shawn Yost**

25.    Shawn Yost has been unhoused and living near the SAR for several decades.  In or around August 2022, officers with the Riverside Police Department seized his property, including his cell phone and personal documents.  Prior to the time that the property was seized, Yost was given a notice and a date on which the City would return.  He planned to move his property in advance of the date on the notice; however, the property was then taken before the date specified on the notice.  He was given no information on where he could retrieve his property.  When he tried to reclaim some of his property as it was being seized, the officers threatened Mr. Yost with arrest.

26.    Bryan Yost is the brother of Shawn Yost.  When the brothers asked where they could safely be, they were told to move to County property; however, the County property presented a significant danger to the Yosts because the area was more susceptible to flooding.

**Defendants**

27.    Defendant CITY OF Riverside (hereinafter "CITY") is a municipal entity, organized as a Charter City under the laws of the State of California, with the capacity to sue and be sued.  The CITY is the legal and political governmental entity responsible for the actions of the Riverside Police Department, Code Enforcement, and all of the CITY's officials, agents and employees. The CITY is sued in its own right and on the basis of the acts of its officials, agents and

employees.  Plaintiffs seek both injunctive and declaratory relief and damages against the Defendant CITY.

28.     Defendant Chief Larry V. Gonzalez (hereinafter "CHIEF GONZALES") is the Chief of Police of the Riverside Police Department (hereinafter "RPD").  He is the official within the RPD responsible for the administration and operation of the RPD.  The policies complained of herein are enforced pursuant to the direction of Chief Gonzalez. He is sued in his official capacity.  Plaintiffs seek injunctive and declaratory relief only against Defendant CHIEF GONZALES.

## FACTUAL ALLEGATIONS

**Riverside Unsheltered Community**

29.     According to the 2022 HUD Annual Homeless Assessment Report to Congress, the number of people experiencing homelessness in the CITY places it in the top five largely suburban cities in the nation with the most residents experiencing homelessness.   As onerous as that distinction is, the 2022 HUD report to Congress also noted that Riverside has more unaccompanied youth experiencing homelessness than any other largely suburban city in the nation with a total of 313, 74% of whom were unsheltered.

30.     The most recent PIT count for Riverside County reported a 12% overall increase in the number of unhoused individuals from 3,316 in 2022 to 3,725 as of May 9, 2023.  This spike was accompanied by an overall rise in unhoused veterans of over 30%.

31.     The City of Riverside's PIT count data indicated that roughly 76% percent of those who responded to the survey indicated that they suffered from some form of disability or were chronically homeless.  According to the California Homeless Data Integration System (HDIS) records for 2022, of the 9,974 people experiencing homelessness in Riverside County, approximately 43%—or 4,290—

reported having a disabling condition.  Family disruption and lack of income were the primary reasons people were experiencing homelessness in 52% of the cases.  Only a small percentage of individuals, roughly 8% of respondents, attributed their unhoused situation to substance abuse or mental illness.

**Riverside Municipal Code**

32.    The Riverside Municipal Code ("RMC") §9.04.600 was promulgated in 2016, before cities in surrounding counties began enforcement of anti-camping ordinances along the SAR.  As amended, the ordinance makes it a crime to camp, use camp facilities, or use camp paraphernalia in or on any public park, street, sidewalk, or other public property unless permitted by law or permit.  Camping restrictions include the use of public property for living accommodations or habitation purposes such as sleeping, laying down bedding, and storing personal property.  Restricted paraphernalia and facilities include tarpaulins, cots, beds, sleeping bags, hammocks, huts, temporary shelters, and tents. Prohibited personal property includes all tangible property, including goods, materials, merchandise, luggage, backpacks, clothing, documents, medication, and household items.

33.    RMC §9.04.610 prohibits any person to camp or use camp paraphernalia; to sit, lie, or sleep; or to store, use, maintain, or place any bulky items or personal property in any location within the Wildland Urban Interface ("WUI"). Personal property restricted under this ordinance includes any and all tangible property to include goods, materials, merchandise, luggage, backpacks, clothing, documents, medication, and household items.  The WUI is defined as a public geographical area identified by the State of California as a "Fire Hazard Severity Zone" in accordance with Public Resources Code Sections 4201 through 4202 and Government Code Sections 51175 through 51189.   The SAR lies within the WUI.  The ordinances enacted by the CITY constitute policies pursuant to *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).  The policy of the CITY, as codified in the identified ordinances and as executed by

the CITY's agents and employees, inflicted the injury of which Plaintiffs complain and creates liability for Defendants pursuant to 42 U.S.C. § 1983.  The practice and custom of enforcement against the Plaintiff class of seizing and destroying property without adequate pre-deprivation notice or post-deprivation notice has inflicted injury on the Plaintiff class and is so widespread as to constitute a policy pursuant to *Monell*.

**The Seizure, Storage and Destruction of Property**

34.     Defendants have enforced RMC §9.04.600 and §9.04.610 to seize Plaintiffs property. Although pre-seizure notice has been given in some instances, the CITY has then ignored the dates provided and seized the property without notice when the unsheltered community leave to go to work, to the bathroom, to a medical appointment, to social services, to eat, or other essential life tasks.  No government entity or law enforcement personnel could reasonably believe that seizing and summarily destroying the property of unhoused individuals, let alone anyone, without prior notice or adequate post-deprivation notice was lawful after the decision of the Ninth Circuit in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012).

35.     Even when Plaintiffs are present and could remove their property, Defendants seize property, including essential items, threatening Plaintiffs and telling them they are only entitled to keep property they can hold and carry at one time.  While Plaintiffs watch in dismay, their property seized, thrown in dumpsters trucks unsegregated from the property of other unsheltered persons and, ultimately, destroyed.   Property is tossed indiscriminately into a dumpster truck with other peoples' property.  This factual scenario is virtually identical to the situation in *Lavan*, when unhoused persons were threatened and restrained by Los Angeles Sanitation employees as they tried to retrieve their property from dump trucks.  And even when, as in *Lavan*, people were told they could retrieve their seized property,

they arrived at the designated site only to learn their property was irretrievably destroyed or that there was no record of their property being brought to the location.

36.     The small amount of seized property that is not destroyed is taken to a storage facility consisting of shipping containers.  If the individual does not have identification, they are not permitted to retrieve their property even if the reason that they do not have identification is that it was seized by City agents when the property was seized.   Because the seized property is transported by throwing everything into the back of a dump truck, there is no segregation of items by ownership.  Property is put into storage bags, commingling the possessions of different people.  Items are often damaged or destroyed when they are cavalierly thrown over into the truck or into the storage containers.

37.     Reclaiming property seized is difficult for many and impossible for some. There is one primary storage place for the entire city, the Riverside Access Center at Hulen Place, shown below.  Most often, a person needs to find out where the facility is since no notice of its location is usually given when the property is seized.  Second, retrieving property requires presenting a receipt provided when the property is taken, but few, if any, unhoused persons are ever given a receipt and pre-deprivation notice.  Also, members of the class report that they could not obtain



their property because they lacked official identification.  Even when they explained that their identification was in the seized property and should be at the facility, they are denied access because they are unable to present identification.

38.    Even if people learn where their property might be, the challenges of distance and travel are overwhelming.  The storage facility essentially consists of several shipping containers in a parking lot that is largely inaccessible to the unhoused population in Riverside.  In order to get to the storage facility, a person may have to travel more than 10 miles. Often the seized items include persons' bicycles, so people cannot ride their bike to the storage location.  This is particularly onerous for people with disabilities that limit their mobility.

39.    While the class members might be able to take a bus to the storage location if they have the bus fare, the closest bus stop is a 15-minute walk to the storage containers for an able-bodied person.  At some points, the sidewalk in this area ends and the walkway consists of patches of dirt, filled with large plant growth and debris.  In all, it is physically inaccessible for people with disabilities.



40.    If a person is successful in getting to the storage location and finds any of their property, after the walk back to the nearest bus stop with their property,

they might not be allowed on the bus because the buses do not permit people to get on with large amounts of property. In addition, the buses in this area of the City are not frequent.  From the locations where some of the class members had their property seized, the trip by bus would be approximately 2 ½ hours each way.

41.     But, in all likelihood, there is little chance any significant amount of property, let alone any personal belongings, will be recovered because of the manner in which the City conducts it sweeps.  The seized property in the storage containers, to the extent that any was collected and retained, is not organized in a manner to segregate and identify the property of individuals.  Rather, any property that is not destroyed on site is simply thrown into the storage containers in an unorganized and indiscriminate manner, making it impossible to recover.

42.     The CITY's policies and practices have left Plaintiffs fearful that they will be threatened with arrest or arrested if they have their property in a public place.  If they are arrested for criminal acts caused by their unhoused status, their property will be left behind and destroyed as "abandoned" before they are released from jail.  If they leave their property even momentarily to go to the bathroom, court, a medical appointment or engage in other basic life functions, what little they have will be seized, destroyed by, or lost to the CITY's employees and agents.

## CLASS ALLEGATIONS

43.     The claims set forth in this action are brought by the class representatives on their own behalf and on behalf of all of those similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3) for injunctive relief and damages.

44.     The putative class includes a significant percentage of the unhoused individuals whose property was in and adjacent to the SAR and various parks throughout the CITY.  By the CITY's own PIT count, the number of unhoused

persons in the CITY exceeds 600 and the number of persons in encampments in the SAR bottom is at least 79 people.

45.     On information and belief, the class consists of more than 70 individuals whose property was seized and destroyed by the CITY throughout the City in the Riverbottom, parks and other public locations beginning in or about January 2022 and continuing to the present.

46.     The class is defined in terms of the objective characteristics of a specific time period, specific locations, and Plaintiffs' status as unhoused.  The members of the class are so numerous that individual joinder of all members is impracticable, if not impossible.

47.     There are common questions of law and fact that predominate over any issue affecting only individual class members.  The violations of the rights of the class members arise from a common set of facts, a common Homelessness Action Plan and a common and deliberate plan of Defendants to confiscate and destroy personal property of members of the putative class. Common questions of law and fact include the following:

a)      whether the Defendant City's policies, practices, and/or custom of seizing unhoused individuals' property, without adequate prior notice or the opportunity to recover property before it is destroyed, violated, and continues to violate Plaintiffs' constitutional rights; and

b)      whether the Defendant City's policies, practices, and/or custom of seizing unhoused individuals' property without opportunity to recover vital personal possessions before the City destroys them, violates Plaintiffs' state statutory rights; and

c)      whether Defendant CITY's policy, practices, and/or custom of arresting and/or threatening arrest of unhoused individuals for violation of a CITY ordinance that criminalizes the necessary activities of unhoused

17

persons in public places violate the Plaintiff class's statutory and state constitutional rights.

d)      The claims of the named Plaintiffs, as the representative parties, are typical of the claims of the class members with respect to the constitutionality and legality of the Defendant City's policies, practices, and conduct at issue here. The named class representatives' claims arise from the same incidents in the same time period as the absentee class members' claims. The prosecution of individual actions against the City by individual class members would create a risk of inconsistent and varying adjudications, which would result in variable standards of conduct for Defendants.

e)      The named Plaintiffs will fairly and adequately protect the interests of the class. The class representatives have no interests that are adverse or antagonistic to those of other class members. Plaintiffs' Class Counsel will also adequately represent the class. Plaintiffs' Counsel are experienced civil rights litigators, including on recent class claims on behalf of unhoused persons in Orange County. Plaintiffs' Counsel are experienced in class action litigation and successfully challenged in Los Angeles and Orange Counties the issues raised by this action, as well as related issues of police enforcement actions on behalf of unhoused communities. Plaintiffs' counsel is in contact with groups and individual advocates for unhoused persons. The organizational plaintiff, who can assist in notifying and identifying class members in this action as they engage in their regular outreach activities.

## INJUNCTIVE AND DECLARATORY RELIEF

48.     As a direct result of Defendants' acts and omissions and the acts and omissions of its representatives and agents, as herein described, Plaintiffs have been and continued to suffer injury from the loss of their property resulting from the City's discriminatory and unlawful policies.   The Plaintiff class has suffered injury from the enforcement of CITY ordinances criminalizing basic daily activities that

Plaintiffs have no choice but to perform in public places, but which the CITY has made criminal. The discriminatory policies and practices herein alleged are ongoing and constitute a continuing violation of Plaintiffs' rights and will result in irreparable injury.

49.     Unless enjoined by the Court, Defendants will continue to engage in the unlawful acts and practices of discrimination described above. Plaintiffs have no adequate remedy at law. Accordingly, they are entitled to injunctive relief.

50.     An actual controversy has arisen and now exists between the parties concerning their respective rights, duties and obligations under federal and state law. Accordingly, Plaintiffs are entitled to declaratory relief.

51.     Plaintiffs will amend the Complaint to seek damages under state law once the requirements of California Government Code §910 *et seq.* are exhausted.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Right to be Secure from Unreasonable Property Seizure
#### 42. U.S.C. 1983 – Fourth Amendment;
#### California Constitution Article I, Sec. 13

52.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

53.     Defendants and their employees and agents violated Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by seizing and then destroying Plaintiffs' property without a warrant. These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property.

54.     Plaintiffs are informed and believe that the acts of the Defendants and their employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, were deliberately indifferent to the likely

19

consequence that the property would be seized and destroyed unlawfully in view of the fact that the right at issue was well-established at the time.

55.     Plaintiffs are informed and believe that the acts of the Defendants and their employees and agents were intentional in seizing Plaintiffs' property pursuant to RMC §9.04.600 and RMC §9.04.610 because the property was considered "unattended" or exceeded the impossibly small limits of what individuals can carry with them at all times, regardless of disability status.

56.     As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and personal injury, as well as to attorneys' fees under Section 1983.

**SECOND CLAIM FOR RELIEF**

**Right To Due Process Of Law; 42 U.S.C. § 1983**

**Fifth and Fourteenth Amendments of the U.S. Constitution; Art. I, § 7**

57.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

58.     Plaintiffs have a protected interest in their property under the California Constitution and California statutory law.

59.     Defendants, their employees and agents, owed Plaintiffs a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution to protect the personal property of the Plaintiffs. This duty applied to: a. providing sufficient pre- or post-deprivation notice that the property will or has been taken and an adequate opportunity to reclaim the property before it is irrevocably destroyed; b. preserving the personal property of individuals arrested and taken into custody.

60.     Despite this well-defined duty, Defendants provided Plaintiffs with inadequate notice that their property was at risk of being seized and/or destroyed and did not act to preserve the property or provide adequate means of reclaiming it

in a timely manner even though the right to such notice and preservation of property was well-established at the time.  On multiple occasions, Defendants gave notice of a "pending" property confiscation, provided no precise date or a date in the future, and then seized and destroyed the property prior to the notice date.

61.     Defendants justified their actions by categorizing the property as "abandoned" because Plaintiffs were not present when the property was seized and destroyed even though the Ninth Circuit Court of Appeals expressly rejected this argument in *Lavan v. City of Los Angeles*, *supra*.

62.     Plaintiffs are informed and believe that the acts of the Defendants, their employees and agents, were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, were deliberately indifferent to the likelihood that the property would be seized and destroyed without due process based on the past occurrences of these same constitutional and statutory violations of the law.

63.     Defendants seized and destroyed the personal property of the Plaintiffs without due process, lawful justification, or just compensation. As a direct and proximate consequence of the acts of Defendants, their agents and employees, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person, as well as to attorneys' fees under Section 1983.

### THIRD CLAIM FOR RELIEF
### Violation of Civil Rights: 42 U.S.C. § 1983, Fourteenth Amendment
### State Created Danger

64.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

65.     By taking and destroying the tents, tarps, blankets, medications, phones and clothing of the Plaintiffs, they have created a danger for Plaintiffs by exposing them to the harsh weather elements without adequate shelter.  Defendants have not provided alternatives and cannot do so because of the near total absence of

appropriate, let alone any, shelter beds in the City. Defendants' actions are particularly egregious given the soaring temperatures in the Inland Empire, where people are dying from heat exposure.

66. Defendants are aware that many of the individuals who reside in the SAR bottom and in parks throughout the City have significant health risks that are exacerbated by living without housing and without essential items for survival as an unhoused person. Warnings of the consequences of prolonged and unrelenting exposure to the heat and sun have been issued repeatedly by federal agencies, including the Center for Disease Control, the Food and Drug Administration, and County departments.

67. As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer actual and potential injury to their health and safety and are entitled to compensatory damages for their property and other injury to their person.

**FOURTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 12101 et seq.: Title II of the**
**Americans with Disabilities Act**

68. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

69. Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

70. At all times relevant to this action, Defendant, its employees and agents, were public entities within the meaning of Title II of the ADA and provided programs, services, or activity to the general public.

71. At all times relevant to this action, the individual Plaintiffs were qualified individuals with one or more disabilities within the meaning of Title II of the ADA and met the essential eligibility requirements under Title II.

72.     Defendants' policies and practices in seizing and destroying Plaintiffs' blankets, tents, other protective gear and medications utilized methods of administration that violate Plaintiffs' rights on the basis of their disabilities. 28 C.F.R. § 35.130(b)(3).

73.     The acts and omissions of the Defendants, their agents and employees, subjected Plaintiffs to discrimination on the basis of their disabilities in violation of Title II of the ADA by destroying their property, and for storing any remaining items following the unlawful seizures in a way that was inaccessible and unreasonable.

74.     Defendants knew, or should have known, that the incidence of disabilities for people who are unhoused is extremely high, with estimates as high as more than one in two unhoused individuals suffering from some significant cognitive, psychological, medical or physical disability, and many suffering from compound disabilities.

75.     Defendants were aware from its own publicly posted demographic information that over one-third of unsheltered individuals residing in Riverside have physical disabilities and  and over one-third have psychiatric disabilities. (source: https://www.riversideca.gov/homelesssolutions/demographics)

76.     As a public entity, Defendants are required to "make reasonable modifications in policies practices, or procedures when such are necessary to avoid discrimination on the basis of disability" where, as here, modifications to would not "fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7). This includes the need to make reasonable accommodations to preserve the essential life-protecting property of persons who are unhoused, as well as provide prompt and reasonable access to storage facilities to ensure that individuals are able to recover seized property and accessible transportation to and from any storage facility.

77.    The policies, practices and procedures challenged in this action, even if otherwise facially neutral, unduly burden disabled persons who are without shelter and within the federal definition of homeless. Defendants committed the acts and omissions alleged herein with intent and/or reckless disregard for the rights of each of these Plaintiffs.

78.    Plaintiffs are informed and believe that Defendants and their agents and employees have failed and continue to fail to adopt and enforce adequate policies and procedures for interacting with unhoused individuals with disabilities.

79.    As a result of Defendants' actions and those of their agents and employees, Plaintiffs have suffered injury to their persons and property and are entitled to compensatory damages, damages according to the provisions of the Americans with Disabilities Act, and attorneys' fees.

## FIFTH CLAIM FOR RELIEF
### Violation of 29 U.S.C. § 794: Section 504 of the Rehabilitation Act of 1973

80.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

81.    Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability … shall, solely by reason of his or her disability, … be subjected to discrimination under any program or activity receiving federal financial assistance …." 29 U.S.C. § 794.

82.    The individual Plaintiffs were, at all relevant times, qualified individuals within the meaning of the Rehabilitation Act because they have a mental and/or medical impairment that substantially limits one or more of their major life activities." 29 U.S.C. § 705(20((B).

83.    At all relevant times and continuing to the present, Defendants were the recipients of federal funding within the meaning of the Rehabilitation Act.

84.    The acts and omissions by Defendants and their agents and employees complained of herein were committed with intent and/or reckless disregard for the

rights of the above-named individual Plaintiffs and discriminated against them on the basis of their respective disabilities.

85.    As a direct and proximate result of the aforementioned acts and omissions by Defendants, Plaintiffs have suffered and continue to suffer injury to their persons, including pain and suffering and are entitled to compensatory damages, damages according to the provisions of the Rehabilitation Act, and attorneys' fees, according to proof.  herein by reference the preceding and any subsequent paragraphs of this Complaint Defendant has an obligation to provide medical care for Plaintiff.

### SIXTH CLAIM FOR RELIEF
### Violation of Bane Civil Rights Act
### Cal. Civ. Code § 52.1

86.    Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth herein.

87.    Defendants' agents and employees have, through arrests, threats of arrest and intimidation interfered with Plaintiffs' rights to maintain their personal possessions and in the exercise of Plaintiffs' rights secured by the Constitution of the State of California, and the statutory laws of the State of California.

88.    As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their statutory rights and are entitled to injunctive relief pursuant to California Civil Code §§ 52 and 52.1.

### SEVENTH CLAIM FOR RELIEF
### Violation of Cal. Civ. Code § 2080 et seq.

89.    Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth herein.

90.    Defendant's policies, practices, and conduct challenged herein violated California Civil Code § 2080 et seq., in that Defendant's agents and employees failed to protect and preserve Plaintiffs' personal property when the property was on the public sidewalk, failed to provide reasonably clear notice that the property

would be taken, and failed to provide post-deprivation notice so that Plaintiffs would have the opportunity to reclaim seized property within a reasonable time.

91.     Cal. Civ. Code § 2080 et seq. imposes a mandatory duty on public agencies to maintain property that is not abandoned for a minimum of 90 days, which the City failed to do.  The CITY destroyed property on site on the pretext that it was abandoned, even thought it well knew that it was not.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for judgement against Defendants as follows:

1.   For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants and their agents and employees from seizing and immediately destroying the property of unhoused individuals without adequate prior and adequate post-deprivation notice and procedures for accessible storage and recovery of the property;

2.   For a temporary restraining order; preliminary and permanent injunction, enjoining and restraining Defendants from enforcing a ban on "camping" and "camping paraphernalia, as those terms are defined in the challenged Riverside Municipal Codes identified hereinabove, including restricting tents, umbrellas or other shade structures or threatening unhoused people with arrest for placing their personal belongings in areas open to the public;

3.   For a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violate Plaintiffs' rights under the federal and state Constitutions and the statutory laws of California;

4.   For an order directing Defendant to provide immediate replacement of blankets, tents, tarps, clothing and other essential items to anyone whose

property is seized for whatever reason, including purported public health and safety grounds;

5. For an order directing Defendant to maintain the property at a location that is accessible and open during regular business hours;

6. For an order directing that any property taken be segregated by owners and not combined with the property of any other person and a receipt be given when the person is present;

7. For an order that all property of persons arrested for "camping" or having "camping paraphernalia" in the locations prohibited in the RMC be booked and provided at the time of release;

8. For damages to the individual plaintiffs in an amount to be determined according to proof;

9. For costs of suit and attorney fees as provided by law; For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby respectfully demand that a trial by jury be conducted with respect to all issues presented herein.


Dated: August 2, 2023                Respectfully submitted,

ELDER LAW AND DISABILITY RIGHTS CENTER

LAW OFFICE OF CAROL A. SOBEL


By: /s/ Brooke Weitzman_____
Brooke Weitzman
Attorneys for Plaintiffs