1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11

RIVERSIDE ALL OF US OR NONE,
an unincorporated association;
MELINDA FOBES, BRYAN YOST,
MARILU PAEZ, SHAWN YOST, and
JADE ANDERSON, all as individuals and
on behalf of similarly situated class
representatives,

                    Plaintiffs,

          v.

CITY OF RIVERSIDE, and LARRY V.
GONZALEZ, in his official capacity as
Chief of the Riverside Police Department,

                    Defendants.

Case No. 5:23-cv-01536-SPG-SP

**ORDER GRANTING, IN PART, AND
DENYING, IN PART, MOTION FOR
SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE,
PARTIAL SUMMARY JUDGMENT
[ECF NO. 141]**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     Before the Court is Defendants' City of Riverside (the "City") and Larry V. Gonzalez ("Defendant Gonzalez, together with the City, "Defendants") Motion for Summary Judgment, or in the alternative, Partial Summary Judgment, (ECF No. 141 ("Motion")). The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court PARTIALLY GRANTS the Motion.

## I.    BACKGROUND[1]

### A.    Factual Background

In October 2022, the City initiated a series of actions aimed at addressing the needs of those experiencing or at risk of homelessness in the City of Riverside.  (ECF No. 49 ("SAC") ¶¶ 9, 10); *see* (JAF 128); (Mot. at 23, 26); (ECF No. 1-2 ("Homelessness Action Plan")).[2]    Among these actions was the adoption of Ordinance No. 7606, amended as Riverside Municipal Code Section ("RMC") § 9.04.600 *et seq*, which prohibited individuals from camping, using camping paraphernalia, or using camping facilities "in or on any public park, street, sidewalk or other public property."  RMC § 9.04.600[3]; *see* (SAC ¶¶ 18, 56, 57).  In particular, the provision made it "unlawful and a public nuisance for any person to camp or use camp paraphernalia or to sit, lie, sleep, or store, use maintain, or place any bulky item or personal property, at . . . wildland urban interface."  RMC § 9.04.610.  The provision further provided that personal property found in violation of § 9.04.610 "may be abated in accordance with procedures in Chapter 6.15, section 9.04.400(G)," which "may include, but is not limited to, removal of bulky items,

---

[1] The following summarized facts are uncontroverted unless otherwise stated.  *See* (ECF No. 141-1 (Joint Appendix of Facts ("JAF"))).  The Court has also previously discussed the facts of this case in its previous orders, to which the parties have not objected.  When determining a motion for summary judgment, the Court considers only evidence admissible at trial, though the form may differ at the summary judgment stage.  *Godinez v. Alta-Dena Certified Dairy LLC*, No. 15-cv-01652 RSWL-SS, 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016).  The Court has reviewed the entire record, including the JAF, ECF No. 141-2 (Joint Appendix of Objections ("JAO")), and ECF No. 143 (Joint Appendix of Evidence ("JAE")).  The Court discusses only the facts that are relevant to its decision.  To the extent the Court relies on evidence that is subject to an objection, the Court overrules the objection for purposes of this Motion.  To the extent the Court does not rely on evidence objected to by the parties, the objections are overruled as moot for purposes of this Motion.

[2] Page numbers cited throughout this Order reference the relevant CM/ECF page numbers unless otherwise specified.

[3] RMC § 9.04.600 *et seq.* was deleted in its entirety on October 24, 2024, by Ordinance No. 7689 §§ 1 and 3.  Riverside Code of Ordinances, Ordinance No. 7689 (2024) https://library.municode.com/ca/riverside/ordinances/code_of_ordinances?nodeId=13307 57 (last accessed December 9, 2025).

personal property, hazardous waste, infectious waste, discarded items, or debris."
*Id.* § 9.04.620(A)–(B).  The enforcement of these abatement provisions is the subject of
this action.

Plaintiffs allege that Defendants, without proper notice, storage, or accommodation,
engaged in a practice of seizing and destroying personal property belonging to unhoused
individuals.  (JAF 180, 181); (SAC ¶¶ 58–69).  Plaintiffs Marilu Paez, Jade Anderson,
Melinda Fobes, Bryan Yost, and Shawn Yost, (collectively the "Individual Plaintiffs"), are
five such unhoused individuals living in and around the Santa Ana Riverbed ("SAR").[4]
(SAC ¶¶ 21–50).  Plaintiff Riverside All of Us or None ("RAOUON") is an unincorporated
grassroots organization that works on behalf of formerly incarcerated individuals (together
with the Individual Plaintiffs, are collectively referred to herein as "Plaintiffs").
(ECF No. 144, Ex. 147 ("RAOUON Webpage") at 19); (ECF No. 174-1, Ex. 172
("Chagolla Dep. 1")).

Defendants are the City of Riverside and Larry V. Gonzalez.  The City is allegedly
"the legal and political governmental entity responsible for the actions of the Riverside
Police Department Code enforcement, and all [City of Riverside] officials, agents, and
employees."  (SAC ¶ 51).  Defendant Gonzalez, who is the Chief of Police of the Riverside
Police Department and is sued in his official capacity, "is the official responsible for the
administration and operation of the [Riverside Police Department]."  (*Id.* ¶ 52).

### 1. The Public Service Engagement Team ("PSET")

In connection with adopting Ordinance No. 7606, the City also implemented a
"Homelessness Action Plan."  *See* (JAF 128); (Mot. at 23, 26); (Homelessness Action
Plan).  One aspect of the Homelessness Action Plan is the expansion of the Public Safety
Engagement Team ("PSET").  *See* (ECF No. 176, Ex. 199 ("PSET Standard Operating

---

[4] In a separate filing, Plaintiffs also seek to certify a class of nearly a thousand unhoused
individuals living within the City / County of Riverside.  The Court reserves ruling on the
issue of class certification, which the Court will consider following the anticipated filing
of the Renewed Motion to Certify Class.  *See* (ECF No. 200 (setting deadline for filing
Renewed Motion to Certify Class as November 19, 2025)).

Procedures") at 334); (Homelessness Action Plan at 16).  PSET is a multi-disciplinary unit that includes Riverside Police Department Law Enforcement Officers, Riverside Code Enforcement Officers ("RCE Officers"), City of Riverside Employees who specialize in Outreach and Engagement, CityNet outreach contractors, trash collection contractors, and previously, Riverside Fire Department Arson Investigators, many of whom "have received POST certified training in homelessness and mental health and have implemented many of [the best practices of the Homelessness Action Plan] into their system of care." (JAF 159); (ECF No. 143-1 at 27–28).  PSET is funded locally by Measure Z, a Riverside City tax measure that increased sales tax. (JAF 147).  As PSET is comprised of several departments that are state and federally funded, some PSET activity is also funded by general police department funds. (JAF 147).

### 2.   PSET Standard Operating Procedures

PSET Code Enforcement Officers are tasked with responding to complaints and alleged violations of Riverside Municipal Code regarding the SAR and the individuals residing in and around the area and, when RMC § 9.04.600 was in effect, were required to comply with the City's procedures for abatement set forth in the Memorandum of Property from the Right-Of-Way/Public Property.  (JAF 128, 129, 130, 163); (ECF No. 175, Ex. 175 ("Property Abatement Memorandum") at 75); (PSET Standard Operating Procedures at 335–36).

Upon receipt of a complaint, a RCE Officer responded to the identified location and investigated whether the alleged violation is present.  (JAF 131); (Property Abatement Memorandum at 75).  If there was no violation, the Officer continued to the site location of another complaint.  (JAF 132).

If there was property located on public property in violation of RMC § 9.04.600 *et seq.*, such as an encampment, the RCE Officer made a series of decisions based on (1) whether the owner of such property could be identified; and (2) whether the property appeared to be intentionally abandoned.  *See* (Property Abatement Memorandum at 75–76).  The RCE Officer was required to first attempt to locate the owner of the property,

determine whether the property itself is safe for review, and inform the property owner that the owner's property should be removed from the public location immediately. (JAF 133, 134); (Property Abatement Memorandum at 75). If the RCE Officer could not locate the owner of the property and it appeared that the property was intentionally abandoned, then the property was "immediately" removed and disposed. (Property Abatement Memorandum at 75). If it did not appear that the property was intentionally abandoned, the RCE Officer was required to post a "Notice of Pending Removal," setting a deadline for property removal "in a conspicuous location," and to photograph the property and posted Notice. (JAF 135, 136, 137); (Property Abatement Memorandum at 75). The RCE Officer was required to provide, at minimum, forty-eight hours in the Notice for removal of the Noticed property. (JAF 138); (Property Abatement Memorandum at 75). During this initial forty-eight-hour period, individuals could remove their property from the Noticed area without restriction. (JAF 141). Anytime thereafter, a RCE Officer was permitted to return to the Noticed area to conduct the abatement. (JAF 138, 170); (Property Abatement Memorandum at 76); *see* (ECF No. 176, Ex. 196 ("Mann Dep. Excerpts") at 287 ("[F]rom the beginning of the lawsuit, it would have been a 48-hour notice, with no real end date. It was just within -- or after 48 hours, the abatement would occur.")).

As an example, in a February 5, 2023, posting, the Notice of Pending Removal stated:

THIS PROPERTY IS LOCATED IN THE CITY OF RIVERSIDE PUBLIC RIGHT-OF-WAY

PURSUANT TO RMC 9.04.400(G); YOU ARE HEARBY ORDERED TO REMOVE ALL OBJECTS, STRUCTURES, PROPERTY, TRASH, DEBRIS, PERSONAL BELONGINGS AND MISCELLANEOUS ITEMS FROM THE RIGHT-OF-WAY.

FAILURE TO DO SO MAY RESULT IN THE PROPERTY BEING CONSIDERED ABANDONED AND REMOVED/DISPOSED OF WITHOUT FURTHER NOTICE.

1     REMOVAL OF PROPERTY IS REQUIRED BY 02/07/2023.

2 (ECF No. 175, Ex. 174 at 72).

3     Once abatement began, individuals were limited from removing items from the

4 Noticed property. (JAF 142, 171). Upon commencing abatement, a RCE Officer

5 photographed the property and made a second determination as to whether the property

6 appeared to be intentionally abandoned. (JAF 140, 165); (Property Abatement

7 Memorandum at 76). If so, hazard-certified PSET officers removed and disposed of the

8 abandoned property. (JAF 139); (Property Abatement Memorandum at 76). For property

9 that did not appear to be intentionally abandoned, as well as any items of value, abandoned

10 or not, RCE Officers tagged the property for storage at 2880 Hulen Pl., Riverside, CA (the

11 "Hulen Access Center"). (JAF 143, 165); (Property Abatement Memorandum at 76).

12 Tagging property required completion of an inventory tag that includes the case number,

13 date of removal, and location of removal. (Property Abatement Memorandum at 76).

14 PSET officers also informed property owners present in the area that they could request for

15 specific items to be stored, and that the City would provide assistance to collect essential

16 items, if needed. (JAF 143). Property was required to be stored at the Hulen Access Center

17 for 90 days before disposal. (JAF 144); (Property Abatement Memorandum at 76).

18 Property owners could reclaim their abated property, "if the subject can clearly identify the

19 property as theirs," and no ID is required for owners to collect their items. (Property

20 Abatement Memorandum at 76); (JAF 145, 175, 179).

21     After abatement, the RCE Officer posted a Notice of Removal, informing

22 individuals that certain property was abated and where it could be retrieved. (Property

23 Abatement Memorandum at 76). The Notice of Removal stated:

24     NOTICE OF REMOVAL

25     THE PROPERTY THAT WAS DEPOSITED IN THE CITY OF

26     RIVERSIDE PUBLIC RIGHT-OF-WAY AT THIS LOCATION HAS BEEN

27     REMOVED BY THE CITY PURSUANT TO RMC 9.04.400(G)

28

THE AFOREMENTIONED PROPERTY WILL BE STORED AT THE
FOLLOWING LOCATION: 2880 HULEN PL., RIVERSIDE, CA AND
CAN BE RECLAIMED MONDAY THROUGH FRIDAY BETWEEN 1:00
P.M. AND 4:00 P.M.

UNLESS THIS PROPERTY IS CLAIMED BY ITS LEGAL OWNER, THIS
PROPERTY WILL BE CONSIDERED ABANDONED AND DISPOSED
OF ON OR AFTER THE DATE INDICATED WITHOUT FURTHER
NOTICE.

PROPERTY WILL BE DISPOSED OF BY: [ninety days after abatement].

(ECF No. 175 at 73); (Property Abatement Memorandum at 76).

When property "constitute[d] an immediate threat to public health/safety" PSET
officers were authorized to "immediately remove the property in order to mitigate the threat
to public health, safety, or welfare." (Property Abatement Memorandum at 76).

**B.    Procedural History**

Plaintiffs initiated this action on August 2, 2023. (ECF No. 1 ("Compl.")). In the
Complaint, Plaintiffs asserted seven claims: five federal civil rights claims under 42 U.S.C.
§ 1983 for (1) the right to be secure from unreasonable property seizure under the Fourth
Amendment; (2) the right to due process of law under the Fifth and Fourteenth
Amendments; (3) violation of civil rights under the Fourteenth Amendment due to a state
created danger; (4) violation of Title II of the Americans with Disabilities Act ("ADA"),
42 U.S.C. § 12101 *et seq.*; (5) violation of Section 504 of the Rehabilitation Act of 1973,
29 U.S.C. § 794; and two California state civil rights claims for (6) violation of California's
Bane Civil Rights Act, Cal. Civ. Code § 52.1; and (7) violation of Cal. Civ. Code § 2080
*et seq.* (*Id.*). Plaintiffs also brought class allegations on behalf of the unhoused individuals
in the City of Riverside "whose property was seized and destroyed by the City throughout
the [city of Riverside] in the Riverbottom, parks and other public locations beginning in or
about January 2022 and continuing to the present." (*Id.* ¶¶ 44, 45).

Shortly after filing the Complaint, on August 16, 2023, Plaintiffs filed an *ex parte* application for Temporary Restraining Order to enjoin Defendants' alleged property seizures and destruction of property. (ECF No. 10). Defendants opposed. (ECF No. 13). On August 23, 2023, the Court denied the *ex parte* application for Temporary Restraining Order and set a hearing on the Motion for Preliminary Injunction. (ECF No. 15). Following the parties' briefing on the Motion for Preliminary Injunction, on November 14, 2023, the Court granted, in part, and denied, in part, the Motion for Preliminary Injunction. (ECF No. 34).

Before the Court partially granted the Motion for Preliminary Injunction, Plaintiffs filed a First Amended Complaint on October 17, 2023. (ECF No. 30 ("FAC")). The Court granted in part Defendants' Motion to Dismiss the FAC on January 23, 2024. (ECF No. 48 ("MTD Order")). The Court granted leave to amend on the ADA claim and concluded that Plaintiffs plausibly alleged the other claims. (*Id.*). Plaintiffs filed the Second Amended Complaint on February 5, 2024, and added one state-law claim alleging discrimination against persons with disabilities in violation of Cal. Gov. Code § 11135. (SAC). The SAC is the operative complaint.

On April 18, 2024, the City of Riverside served the County of Riverside ("the County") as a third-party defendant. (ECF No. 61). On June 11, 2024, the City of Riverside filed a First Amended Third-Party Complaint against the County of Riverside, alleging equitable contribution and indemnification claims, as well as violations of its Due Process and Equal Protection rights under the Fourteenth Amendment. (ECF No. 65). On November 22, 2024, the Court granted in part, and denied, in part, the City's Motion to Dismiss and granted leave to amend the contribution cause of action. (ECF No. 97). On December 10, 2024, the City filed a Second Amended Third-Party Complaint. (ECF No. 98). On June 6, 2025, the Court denied the County's Motion to Dismiss the Second Amended Third-Party Complaint. (ECF No. 136).

In the interim, on January 6, 2025, Plaintiffs filed a Motion for Class Certification, seeking to represent a class of over a thousand unhoused individuals. (ECF No. 105). The

Court denied the Motion for Class Certification without prejudice to it being refiled, finding pursuant to Federal Rule of Civil Procedure 23(a) that Plaintiffs did not allege commonality among the proposed members of the class. (ECF No. 190).

On June 20, 2025, the parties filed the present Motion for Summary Judgment. (Motion). Defendants City and Larry V. Gonzalez filed a reply in support of the Motion on July 1, 2025. (ECF No. 182 ("Reply")).

## II.    LEGAL STANDARD

Summary judgment is appropriate where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing the absence of any genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). *See also McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988) ("[A]t summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party.").

To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that generic disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  Instead, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  No genuine issue for trial exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.*

## III.  DISCUSSION

The Court first addresses the parties' evidentiary requests and objections.  The Court will then consider the arguments raised in the Motion, wherein Defendants seek summary judgment on all eight of Plaintiffs' claims.  Defendants first argue that all Plaintiffs lack standing.  Defendants also argue that all claims fail on the merits, that they are entitled to qualified immunity on the § 1983 claims and discretionary immunity on the state law claims, and that Defendant Gonzalez cannot be held liable on Plaintiffs' § 1983 claims under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

### A.    Evidentiary Requests and Objections

The parties each filed requests for judicial notice of various exhibits and public documents.  *See* (ECF No. 141-3 ("Ds' RJN")); (ECF No. 141-4 ("Ps' RJN")).  Defendants also object to Plaintiff Anderson's January 3, 2025, Declaration, and request that it be struck under the sham affidavit rule as contradictory to prior testimony.  (Mot. at 35–36).  The Court evaluates these requests in turn.[5]

#### 1.    Requests for Judicial Notice

Federal Rule of Evidence 201(b) provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can accurately and readily determine from sources

---

[5] In the Reply, Defendants make two additional requests: (1) that the Court strike declarations of individuals not named in the lawsuit; and (2) that summary judgment be granted because Plaintiffs did not dispute the testimony of Defendants' expert Mike Lozeau.  (Reply at 6, 10).  First, the Court does not rely on the declarations at issue and thus declines to strike these documents.  Second, on September 8, 2025, after the Reply was filed, the Court granted Plaintiffs' Motion to Exclude the Testimony of Defendants' Expert, Mr. Michael Lozeau.  (ECF No. 199).  The Court therefore declines to grant summary judgment on these grounds.

-10-

whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Woodall v.
Walt Disney Co.*, No. 20-cv-3772-CBM-E, 2024 WL 5337348 (C.D. Cal. Nov. 1, 2024)
(granting the parties' requests for judicial notice filed in connection with cross-summary
judgment motions). Courts may judicially notice "undisputed matters of public record,"
but generally may not notice "disputed facts stated in public records." *Lee v. City of Los
Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v.
County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

### a)   Defendants' Request for Judicial Notice

Defendants request the Court take Judicial Notice of three sets of documents. *See*
(Ds' RJN). The first is a collection of public webpages and incident information fact sheets
created by the City of Riverside – Riverside Fire Department regarding fires that occurred
in the river bottom. (*Id.* at 2–4). The second is the City's Abatement Policy, which
includes "the Memorandum dated 8/20/2018; 2.14 Homeless Encampment Enforcement;
Public Safety Engagement Team Standard Operating Procedures." (*Id.* at 5). The third is
a GIS [Geographic Information System] Map regarding the City and County of Riverside's
jurisdiction in the SAR area. (*Id.*). Plaintiffs have not opposed Defendants' request.

As to the first set of documents, the Court takes judicial notice of the existence of
the public webpages and the fact that the webpages contain referenced content, but it does
not take judicial notice of the truth of what is stated in the webpages. *See Gerritsen v.
Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015) ("[T]o the extent the
court can take judicial notice of press releases and news articles, it can do so only to indicate
what was in the public realm at the time, not whether the contents of those articles were in
fact true."). Regarding the City's Abatement Policy, the Court "may take notice of
department policies," and the Policy is relevant to the adjudication of Plaintiffs' claims.
*Chung v. Cnty. of Santa Clara*, 614 F. Supp. 3d 709, 718 (N.D. Cal. 2022). The Court also
takes judicial notice of the GIS map. Courts have previously taken judicial notice of maps
"whose accuracy regarding locations cannot be reasonably questioned." *Kunde Enters.,
Inc. v. Nat'l Sur. Corp.*, 608 F. Supp. 3d 883, 895 (N.D. Cal. 2022); *see also New Cingular

*Wireless PCS, LLC v. City of W. Covina, California*, No. 2:22-cv-01642-MEMF-JC, 2023 WL 4422835, at *2 (C.D. Cal. July 10, 2023) (citing cases).

Accordingly, the Court GRANTS Defendants' request for judicial notice.

*b)    Plaintiffs' Request for Judicial Notice*

Plaintiffs request the Court take Judicial Notice of the following eight filed exhibits. (Ps' RJN at 3).

1.    Exhibit 205, a true and correct copy of Cal Fire's Riverside Fire Hazard Severity Zone for 2022;

2.    Exhibit 217, a true and correct copy of the Riverside HHS Community Development Block Grants Funding webpage;

3.    Exhibit 218, a true and correct copy of Riverside Parks and Rec Scholarship Information webpage;

4.    Exhibit 219, a true and correct copy of the Riverside Parks and Rec Planning Projects- ARPA webpage;

5.    Exhibit 220, a true and correct copy of the City of Riverside – Crime Dashboard;

6.    Exhibit 221, a true and correct copy of the California Highway Patrol website: CHP Distributes over $25 Million to Fight Impaired Driving;

7.    Exhibit 222, a true and correct copy of the Riverside Police Department's Safety and Security Grant; and

8.    Exhibit 223, a true and correct copy of a video of the Riverside City Council Meeting, October 22, 2024, produced by the City of Riverside.

(*Id.*).  Defendants have not opposed Plaintiffs' requests.

The Court GRANTS Plaintiffs' request for judicial notice of all eight documents as public records and government documents.  "[T]he court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." *Gerritsen*, 112 F. Supp. 3d at 1033–34 (internal quotation marks and citation omitted).  "Judicial notice of city council minutes, transcript,

and video recording as public records is proper," as well. *Insight Psychology & Addiction, Inc. v. City of Costa Mesa*, 724 F. Supp. 3d 1067, 1078–79 (C.D. Cal. 2024). Plaintiffs' exhibits include webpages published by departments within the City of Riverside, (Exs. 217, 218, 219, 220, 222), the California Highway Patrol, (Ex. 221), and California Department of Forestry and Fire Protection, (Ex. 205), all of which are governmental entities. Plaintiffs also request judicial notice of a video recording of the Riverside City Council meeting, (Ex. 223). (Ps' RJN at 3). As these are all public records and government documents, the Court may properly take judicial notice of these exhibits. The Court GRANTS Plaintiffs' request for judicial notice.

### 2. Sham Affidavit Rule

Defendants raise an evidentiary objection to the Declaration of Plaintiff Jade Anderson, dated January 3, 2025, and request that the Declaration be stricken. (Mot. at 36 (citing (ECF No. 176 ("Anderson Decl.") at 468))). According to Defendants, the Declaration contradicts testimony taken on November 20, 2024, by referencing a June 2023 abatement date, which was not discussed during the November 20, 2024, deposition. (*Id.*); *see* (ECF No. 174, Ex. 170 ("Anderson Dep.") at 2). Plaintiffs argue that the Declaration contains newly remembered facts, which does not contradict deposition testimony. (*Id.* at 37).

"To trigger the sham affidavit rule, a district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Doe (S.A.S.) v. Hilton Domestic Operating Co. Inc.*, No. 3:23-cv-06038-TMC, 2025 WL 2306579, at *8 (W.D. Wash. Aug. 11, 2025) (citing *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012)). "Newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham." *Yeager*, 693 F.3d at 1081.

The Court agrees with Plaintiffs that it is not "clear and unambiguous" that the January 3, 2025, affidavit contradicts the deposition testimony. *See id.* at 1080; *compare*

(Anderson Decl. at 469) *with* (Anderson Dep. at 57–58).  The inclusion of an abatement date not discussed during the deposition, particularly when the deposition ended early at Plaintiff Anderson's request, does not contradict the testimony itself.  *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009) ("[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition[, and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.").  Plaintiffs reasonably explained that the absence of discussion about the June 2023 abatement was an honest discrepancy due to Plaintiff Anderson's health the day of the deposition. (Mot. at 37).  In addition, more than a year had passed between the June 2023 abatement and the November 20, 2024, deposition.  (*Id.*).  Under these circumstances, the Court declines to strike Plaintiff Anderson's January 3, 2025, Declaration based on the sham affidavit rule.

## B.    Standing

The Court next addresses the parties' standing arguments.

Defendants argue that the Court lacks subject matter jurisdiction over all claims because none of the Individual Plaintiffs have standing, and RAOUON does not have associational standing. (*Id.* at 31–32).  Plaintiffs contest Defendants' characterization of the facts, arguing that the Individual Plaintiffs have provided evidence sufficient to demonstrate standing, and that RAOUON has standing based on a "diversion-of-resources" injury. (*Id.* at 32–35).

Though the Court addressed the issue of standing in its Order Granting, in Part, Defendant's Motion to Dismiss, (MTD Order at 4–8), the Court has "a continuing obligation to assure [its] jurisdiction." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 763 n.6 (9th Cir. 2018).  Based on the facts developed in the record, the Court "revisits this question." *Id.*

1          1.    <u>Individual Standing</u>

2          To satisfy the "irreducible constitutional minimum of standing," a plaintiff bears the

3    burden of establishing three elements: (1) the plaintiff suffered an injury in fact; (2) the

4    injury is fairly traceable to the defendant's challenged conduct; and (3) the injury is likely

5    redressable by a court's favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–

6    61 (1992). "A plaintiff must demonstrate constitutional standing separately for each form

7    of relief requested." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018).

8    "Each element must be supported in the same way as any other matter on which the plaintiff

9    bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the

10   successive stages of the litigation." *Lujan*, 504 U.S. at 561.

11         "A motion for summary judgment premised on a lack of standing may be defeated

12   by showing some genuine dispute of material fact as to the elements of standing; a plaintiff

13   need not establish they in fact have standing." *Bilodeau v. City of Medford*, No. 1:21-cv-

14   00766-CL, 2024 WL 1470516, at *6 (D. Or. Jan. 16, 2024), *report and recommendation*

15   *adopted*, No. 1:21-cv-00766-CL, 2024 WL 1462328 (D. Or. Apr. 4, 2024) (citing *Cent.*

16   *Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)). A plaintiff "must

17   set forth by affidavit or other evidence specific facts, which for purposes of the summary

18   judgment motion will be taken as true." *Lujan*, 504 U.S. at 561 (citing Fed. R. Civ. P.

19   56(e)).

20         Defendants argue that no Individual Plaintiff has demonstrated standing because

21   there is no dispute of material fact that their belongings were not seized by the City, and

22   they have not satisfied the procedural prerequisites to bring their state law claims. (Mot.

23   at 31–32). As discussed below, all Individual Plaintiffs dispute Defendants' facts as it

24   relates to their injuries and whether their injuries are traceable to Defendants.

25              a)    *Plaintiff Marilu Paez*

26         Defendants assert that Plaintiff Marilu Paez ("Plaintiff Paez") lacks standing because

27   (1) she has never interacted with Riverside Police Department Police Officers, and (2) has

28   not proven that she was disabled when her belongings were taken in June of 2023. *See* (*id.*

at 16, 31)).  Plaintiffs disagree, arguing that Plaintiff Paez saw City police officers when
she tried to remove her personal property from SAR and that, because of the City's actions,
Plaintiff Paez "lost all her possessions."  (*Id.* at 33).

The Court finds that Plaintiff Paez has sufficiently demonstrated standing.  *See, e.g.*,
*Homeless Action! v. Cnty. of Sonoma*, No. 18-cv-01955-VC, 2025 WL 1836651, at *1
(N.D. Cal. July 3, 2025) (finding that plaintiff had standing for injunctive relief because
she "presents evidence that she is homeless, has had her belongings taken by the defendants
during sweeps, and has sought and been denied disability accommodations").

First, Plaintiff Paez has pointed to evidence demonstrating that she was injured: her
possessions were thrown away during a "cleanup at the river bottom" in June of 2023.  *See*
(ECF No. 175-1, Ex. 187 ("Paez Dep. 1") at 135).  These possessions amounted to "all
[her] belongings," including medication, ID cards, makeup, and a cell phone with pictures.
(*Id.* at 135–36, ECF No. 175-2, Ex. 187 ("Paez Dep. 2") at 22).  Further, Plaintiff has
provided testimony that, shortly thereafter, in July or August of 2023, Plaintiff Paez went
to the Hulen Access Center to retrieve the possessions taken during the June 2023
abatement but was told that her belongings were not stored there.  (Paez Dep. 2 at 37, 38,
40); (ECF No. 176 ("Paez Decl.") at 478).  Plaintiff Paez's inability to retrieve her
belongings at Hulen Access Center is sufficient to demonstrate injury.

Second, Plaintiff Paez has raised a dispute of material fact whether the City of
Riverside or the County of Riverside conducted the June 2023 abatement.  Plaintiff Paez
testified that, though she did not know whether the County or City of Riverside took her
belongings, she identified a bell logo on the employee's trucks.  *See* (Paez Dep. 2 at 5–6
("I know it was the white trucks, the white trucks with the Riverside -- County of Riverside
. . . It was the Riverside -- the one with the circle.  That's what I remember.  With the bell.
The trucks.")); (Paez Dep. 2 at 14–15 ("Q. But you don't know if it's County or City?  A.
I don't know. I mean, honestly, I don't know if there's a difference.  I know it was the one
with the bell and it said, 'Riverside County' -- I'm going to say 'County.'  But I'm not
going -- I wasn't paying attention. All I know is that they're all white trucks.")).  Plaintiffs

argue that this bell logo is the logo of the City of Riverside, not the County, and thus the City abated Plaintiff Paez's property. (Mot. at 33). Viewing the evidence in the light most favorable to the nonmoving party in a summary judgment ruling, Plaintiff Paez's injury is fairly traceable to the City.

Third, Plaintiff Paez seeks compensatory damages, statutory damages, and injunctive relief. Based on Plaintiff Paez's injury and the dispute of material fact regarding Defendants' involvement, Plaintiff Paez has standing to seek such relief. *See Smith v. Municipality of Anchorage*, No. 3:23-cv-00257-SLG, 2025 WL 2097457, at *6 (D. Alaska July 24, 2025) (citing cases where a homeless plaintiff had standing to challenge municipal abatement procedures).

### b)    *Plaintiff Jade Anderson*

Defendants assert that Plaintiff Jade Anderson lacks standing because he did not submit evidence demonstrating that his property was unlawfully taken by the City. (Mot. at 19). Plaintiffs counter that Plaintiff Anderson's deposition testimony demonstrates that Defendants abated Plaintiff Anderson's property without proper notice. *See* (JAF 19–45).

The Court finds that Plaintiff Anderson has established a triable issue of fact that he was injured by Defendants and therefore has standing. Plaintiff Anderson testified that the Riverside Police Department has taken his belongings three or four times, and that PSET has abated his property at least fifteen times. (Anderson Dep. at 58); (Mann Dep. Excerpts at 285). One abatement occurred around June 2023, during which Riverside Police and RCE Officers took Plaintiff Anderson's identification, bank and debit cards, seizure medication, and blankets, and informed him that his belongings would be stored at the Hulen Access Center. (Anderson Decl. at 469). When Plaintiff Anderson went to the Hulen Access Center, however, his property was not there. (*Id.*). Another such abatement occurred on September 11, 2023. (JAF 40). The Riverside Police Department posted notice before the September abatement, but the parties' dispute whether notice was posted for 24 or 48 hours previously. (JAF 40, 42). These facts demonstrate that there is, at a minimum, a genuine dispute of material fact as to whether Plaintiff Anderson has standing.

Taking the facts set forth in Plaintiff Anderson's declaration and testimony "as true" for the purposes of this summary judgment motion, *Lujan*, 504 U.S. at 561, the Court finds at this stage of the proceeding that Plaintiff Anderson has standing.

c)    *Plaintiff Melinda Fobes*

Defendants argue that Plaintiff Melinda Fobes has not presented sufficient evidence demonstrating that her property was abated in August 2022 and December 2022. (Mot. at 20). Specifically, Defendants assert that (1) the City did not perform abatements at all in August 2022; and (2) Plaintiff Fobes was given sufficient notice that her property would be abated in December 2022. (*Id.*). Plaintiffs point the Court to Plaintiff Fobes' deposition testimony to demonstrate that (1) the City abated her property in August 2022; and (2) Plaintiff Fobes did not receive notice of the December 2022 abatement. (*Id.* at 33).

The Court finds that Plaintiff Fobes has pointed to evidence demonstrating that she has standing. There is a genuine dispute of material fact whether Plaintiff Fobes' property was abated in August 2022. Plaintiff Fobes testifies that about a month and half before, officials from the water district informed her that "they would give [her] notice" "when it was time to leave." (ECF No. 175, Ex. 182 ("Fobes Dep.") at 116). Then in August 2022, though she was not present at the time and arrived after the bulldozing, Plaintiff Fobes observed bulldozers removing items from another campsite. (*Id.* at 120–21). After the removal, Plaintiff Fobes was told by police officers that she could not retrieve her belongings. *See* (*id.* at 127) ("[The officers] were down in the river bottom so nobody could go, because it was a big old pile of everybody's stuff so nobody could go in there and try and pick out their things."). As a result, Plaintiff Fobes lost her ID. (*Id.* at 125). Taking her testimony as true, Plaintiff Fobes has alleged that her property was destroyed in August 2022.

Even if Plaintiff Fobes did not present sufficient evidence that her property was abated in August 2022, Defendants do not dispute that an abatement occurred in December 2022—only that Plaintiff Fobes did not have a possessory interest in the property removed during that abatement. (Mot. at 20–21).

1    Plaintiff Fobes testified that in December 2022, Riverside Police officers towed her

2    truck, threw away everything inside, and she never received a notice of removal.  (Fobes

3    Dep. at 128–30, 152–53).  Defendants argue that Plaintiff Fobes did not provide evidence

4    demonstrating that she was the legal owner of the truck.  (Mot. at 20).  Regardless of

5    whether Plaintiff Fobes held legal title to the truck, she has demonstrated sufficient facts

6    to establish that she owned items located inside the truck that were thrown out by Riverside

7    City Police Officers, which included clothing, a backpack with school supplies, and her

8    father's ashes.  (JAF 81); (Fobes Dep. at 112, 150–55).  Based on this testimony, Plaintiff

9    Fobes has demonstrated her loss of property is fairly traceable to the City's challenged

10   conduct.  Plaintiff Fobes therefore has standing to seek relief for her loss of property.

11               *d)    Plaintiff Bryan Yost*

12   Defendants argue that Plaintiff Bryan Yost lacks standing because, like Plaintiff

13   Fobes, (1) his property was never abated in August 2022 because the City did not conduct

14   an abatement during that month; and (2) he received notice before the December 2022

15   abatement and therefore relinquished his possessory interest in the abated property.

16   (Mot. at 21–22).

17   The Court finds that Plaintiff Bryan Yost has demonstrated standing because he did

18   not relinquish his property interest in the property abated in December 2022 and presents

19   a dispute of material fact as to whether Defendants provided adequate notice of abatement.

20   Plaintiff Bryan Yost testified, to which Defendants do not object, *see* (JAO), that Riverside

21   Police officers threw his belongings in a dumpster despite statements that he "need[ed] to

22   grab some of [his] stuff."  (ECF No. 174, Ex. 171 ("B. Yost Dep. 1") at 138).  During the

23   December 2022 abatement specifically, PSET officers threw his backpack containing a

24   wallet, jewelry, and personal keepsakes into a dumpster.  (ECF No. 174-1, Ex. 171

25   ("B. Yost Dep. 2") at 2).  In addition, he testified that the Notice of Pending Removal did

26   not indicate a deadline to remove his property.  (B. Yost Dep. 1 at 136 ("There was a paper,

27   a sheet of paper, but it didn't have a date . . . It wasn't fully filled out.  Like, they didn't

28   give a date to move by.")).  Taken together, Plaintiff Bryan Yost has established a genuine

dispute of material fact as to whether Defendants provided notice of the December 2022 abatement, and whether his property was improperly abated.

### e)   *Plaintiff Shawn Yost*

Defendants similarly argue that Plaintiff Shawn Yost lacks standing because the City of Riverside has properly provided notice before any asserted abatement. In particular, Defendants argue that the May 2023 abatement referred to in Plaintiff Shawn Yost's declaration and testimony was performed by the County of Riverside, not the City. (Mot. at 22).

Plaintiff Shawn Yost has established that he was injured by the City of Riverside. He testified that the City threw away "all [his] personal stuff," including a physical driver's license, during a May 2023 abatement. (ECF No. 176, Ex. 192 ("S. Yost Dep.") at 53); *see also* (S. Yost Dep. at 201) ("The first major one when they had taken all my stuff, yes, they took my tent that had my personal belongings, I mean, all of my credentials and everything in it and wouldn't let me go back and retrieve it."); (ECF No. 176 ("S. Yost Decl.") at 490 ("The most recent time my property was destroyed by the City's employees was in May 2023. I learned about the sweep when my friend woke m[e] up and informed me that the City was at the camp to conduct a sweep. Both code enforcement and City police were present.")). Further, when Plaintiff Shawn Yost went to the Hulen Access Center in July of 2023 to retrieve his belongings, nothing was tagged with his name on it. (S. Yost Dep. at 210–11, 214). Plaintiff Shawn Yost's testimony provides sufficient evidence to demonstrate that he suffered an injury fairly traceable to Defendant City's challenged conduct.

In sum, the Court finds that all the Individual Plaintiffs, at this juncture, have standing to bring this action.

### 2.   Organizational Standing

An organization may have "direct standing to sue," and it may also "assert standing on behalf of [its] own members." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662–63 (9th Cir. 2021).

"Direct organizational standing can be satisfied if the organization alleges that a defendant's actions 'affected and interfered with [a plaintiff's] core business activities.'" *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025) (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024)). The organization must establish that it was injured through "both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (internal quotation marks and citation omitted). "In other words, an organizational plaintiff must show that the defendant's actions run counter to the organization's purpose, that the organization seeks broad relief against the defendant's actions, and that granting relief would allow the organization to redirect resources currently spent combating the specific challenged conduct to other activities that would advance its mission." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019). However, an organization does not have standing when it simply "diverts its resources in response to a defendant's actions." *Hippocratic Med.*, 602 U.S. at 395. Instead, the defendant's actions must interfere with the plaintiff's core activities and longstanding mission, "which remain the same apart from, prior to, and after" the defendant's contested action. *Immigrant Defs. L. Ctr.*, 145 F.4th at 988.

The analysis for associational standing is the same as for an individual plaintiff. *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088. An organization has associational standing to bring suit on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Defendants argue that RAOUON does not have direct standing or associational standing. According to Defendants, RAOUON does not have direct standing because the mission of the organization is dedicated to helping incarcerated individuals, and the interest of assisting unhoused individuals from alleged unlawful seizures is unrelated to the

organization's purpose.  (Mot. at 32 (citing *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998))).  Defendants argue RAOUON also does not have associational standing because there is no evidence that any of the Individual Plaintiffs are formerly or currently incarcerated.  (*Id.*).  RAOUON argues that it has direct standing to sue because its mission is dedicated to fighting discrimination in all forms, and it has diverted resources it otherwise would not have to assist unhoused individuals to recover or replace property abated by Defendants.  (*Id.* at 35).

The Court finds that RAOUON does not have direct organizational standing or associational standing.[6]

### a)  *Direct Organizational Standing*

Because Defendants' actions do not affect and interfere with its core business activities, the Court finds that RAOUON does not have direct standing under *Hippocratic Med.  See* 602 U.S. at 395–96.  The Ninth Circuit has recently instructed that "a plaintiff must show far more than simply a setback to the organization's abstract social interests" to assert direct organizational standing.  *Immigrant Defs. L. Ctr.*, 145 F.4th at 987 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  "[A]n organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization."  *Id.* (first citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982), then citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

---

[6] The Court previously found that RAOUON had direct organizational standing in its Order Denying, In Part, Defendant's Motion to Dismiss.  (MTD Order at 4–8).  Since then, the Supreme Court issued *Hippocratic Medicine*, clarifying that an organization has direct standing when it can show that a challenged government action "directly affect[s] and interfere[s] with" plaintiff's core business activities, akin to "a retailer who sues a manufacturer for selling defective goods to the retailer."  602 U.S. at 395.  In other words, the resources an organization expends must advance activities conducted prior to the challenged action.  *See Immigrant Defs. L. Ctr.*, 145 F.4th at 988.

RAOUON is an organization "dedicated to helping individuals who were previously incarcerated." (JAF 111). Through its parent organization and fiscal sponsor, Starting Over, Inc., RAOUON is "part of a national organizing initiative of formerly incarcerated people, [] families, friends, and allies" that "fight[s] for the rights of formerly and currently incarcerated people." (JAF 112); (RAOUON Webpage at 19). Fidel Chagolla, an organizer for RAOUON, testified during his deposition that one of RAOUON's mission statements is "to fight all forms of discrimination." (JAF 112); (Chagolla Dep. 1 at 137). As a part of its community outreach in Riverside, RAOUON provides services to unhoused individuals, informs them about transitional housing, and assists them with a variety of different resources, including "food distributions, clothing, and hygiene kits." (Chagolla Dep. 1 at 137). When the City conducts homeless encampment sweeps, RAOUON [and Starting Over, Inc.] staff divert their time and attention to assisting those impacted by such sweeps. (JAF 115); (Chagolla Dep. 1 at 137–39).

Nevertheless, RAOUON lacks direct standing in this case because assisting unhoused individuals whose property was seized and destroyed during abatement is a step afar from RAOUON's mission statement of "helping individuals who were previously incarcerated," and "fight[ing] for the rights of formerly incarcerated and currently incarcerated people." (JAF 111); (RAOUON Webpage at 19). This case is unlike *Immigrant Defenders Law Center*, in which an immigrants' rights organization had standing to challenge an immigration policy that impacted its "core business activities and longstanding mission of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings." *Immigrant Defs. L. Ctr.*, 145 F.4th at 988. Those core activities "remained the same apart from, prior to, and after [the policy's] implementation." *Id.*

The same cannot be said for RAOUON. Plaintiffs have not pointed the Court to facts demonstrating that RAOUON provided services dedicated to unhoused individuals prior to the City's abatement proceedings. It was not until after RAOUON learned of the abatement proceedings that the organization "diverted staff and volunteer time and

resources to assisting unhoused individuals whose property was seized and destroyed— work it otherwise would not be doing." (Mot. at 35); (JAF 115). Responding to the impact of an abatement proceeding is therefore not among RAOUON's core business activities of "fight[ing] for the rights of formerly and currently incarcerated people." (RAOUON Webpage at 19). RAOUON's longstanding mission "to fight all forms of discrimination" does not compel a different result. Though Plaintiffs have provided evidence that it spent resources, time, and even hired staff in response to Defendants' actions, the abatement policy does not impose an impediment to RAOUON's core business activities. *See Hippocratic Med.*, 602 U.S. at 395–96.

> b) *Associational Standing*

The Court also finds that RAOUON does not have associational standing to sue. At the Motion to Dismiss stage, the Court previously found that RAOUON failed to establish standing under the first and third prongs of *Hunt*. (MTD Order at 7–8); 432 U.S. at 343. The Motion for Summary Judgment suffers from the same deficiencies.

As to the first prong, the JAF does not indicate that any of the Individual Plaintiffs were formerly incarcerated, and thus the interests of the Individual Plaintiffs were not germane to RAOUON's mission of changing policy for formerly incarcerated individuals. Regarding the third prong of the *Hunt* analysis: the SAC still seeks individual damages, and RAOUON does not have associational standing or representational standing to seek such damages. *See* (SAC at 33). Therefore, RAOUON does not have associational standing.

In sum, the Court finds that there are triable issues of fact regarding the Individual Plaintiffs' injuries and whether they remain at substantial risk of immediate future harm and therefore DENIES the Motion insofar as it challenges the Individual Plaintiffs' standing. However, the Court finds that RAOUON does not have direct or associational standing and therefore GRANTS Defendant's Motion insofar as it asserts RAOUON lacks standing to bring the claims in the SAC. The Court thus addresses next whether triable issues of fact remain as to the Individual Plaintiffs' claims.

1      ### C.    Claims 1-3: § 1983

2          "42 U.S.C. § 1983 creates a cause of action against a person who, acting under color

3      of state law, deprives another of rights guaranteed under the Constitution." *Jones v.*

4      *Williams*, 297 F.3d 930, 934 (9th Cir. 2022).  To prevail on their section 1983 claims,

5      Individual Plaintiffs must demonstrate that an action (1) occurred "under color of state

6      law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer*

7      *v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988).  As the party moving for summary

8      judgment, Defendants bear the initial burden of proving "an absence of evidence to support

9      [the nonmoving party's] case." *Archer v. Gipson*, 108 F. Supp. 3d 895, 907 (E.D. Cal.

10     2015) (quoting *Celotex Corp.*, 477 U.S. at 325).  The parties do not dispute that Defendants

11     acted under color of state law; instead, the arguments focus on whether Defendants' actions

12     violated Individual Plaintiffs' constitutional rights under the Fourth and Fourteenth

13     Amendments.  The Court evaluates the parties' arguments in that order.

14         ### 1.    Claim 1: Fourth Amendment, Unreasonable Property Seizure

15         Defendants seek summary judgment on Individual Plaintiffs' Fourth Amendment

16     unreasonable property seizure claim, arguing that no unlawful seizure occurred because

17     (1) Plaintiffs did not present evidence that the City abated their property; (2) the City

18     provided notices of the abatements it did conduct; and (3) any abated property was

19     abandoned, and no Plaintiff retained a possessory property interest in such property.  (Mot.

20     at 40–42).  Plaintiffs counter that (1) the City has abated property belonging to Individual

21     Plaintiffs; (2) the City did not provide proper notice of how to reclaim seized property; and

22     (3) there are disputes of fact as to whether the abated property was abandoned at the time

23     of seizure.  (*Id.* at 45–46).

24         The government conducts a seizure when "there is some meaningful interference

25     with an individual's possessory interests in that property." *Miranda v. City of Cornelius*,

26     429 F.3d 858, 862 (9th Cir. 2005).  The Fourth Amendment prohibits unreasonable

27     government seizures of individual property, "even when that property is stored in public

28     areas." *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1118 (9th Cir. 2021).  It follows that

an individual does not relinquish protection of the Fourth Amendment by "living on the street." *Recchia v. City of Los Angeles Dep't of Animal Servs.*, 889 F.3d 553, 558 (9th Cir. 2018) ("[S]eizure of a homeless person's property implicates important Fourth Amendment concerns."). When public encampment and property abatement ordinances are the subject of a Fourth Amendment case, "[v]iolation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027, 1029 (9th Cir. 2012); *see also Miranda*, 429 F.3d at 864 (holding that seizing property pursuant to the authority of a city ordinance "does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment").

A warrantless seizure is "per se unreasonable" unless it "falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). One "well-established exception" to the Fourth Amendment's warrant requirement is the abandonment doctrine. *United States v. Hunt*, 153 F.4th 858, 866 (9th Cir. Aug. 27, 2025). An individual does not retain a property interest in voluntarily abandoned property and, thus, the government cannot interfere with any possessory interest in such property upon seizure. *See United States v. Baker*, 58 F.4th 1109, 1116 (9th Cir. 2023) ("Because warrantless searches or seizures of abandoned property do not violate the Fourth Amendment, persons who voluntarily abandon property lack standing to complain of its search or seizure."). Whether property is deemed abandoned is a factual question of intent, when, through "words, acts or other objective indications," a person has manifested an intent to abandon property at the time of the search or seizure. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). This is based on a totality of the circumstances, and two "important" factors a court may consider are the "denial of ownership and physical relinquishment of the property." *Id.*; *see also Sage v. Cnty. of Monterey*, No. 22-cv-07083-BLF, 2024 WL 2941753, at *11 (N.D. Cal. June 10, 2024) (denying summary judgment on a homeless plaintiff's Fourth Amendment seizure claim, finding that plaintiff did not abandon her RV, trailer, and personal property, even after receiving notice of removal).

For example, the court in *Coal. on Homelessness v. City & Cnty. of San Francisco* held that unhoused plaintiffs raised triable issues of fact when the city did not provide adequate time for them to remove their belongings and did not store the removed personal property during an abatement proceeding.  786 F. Supp. 3d 1264, 1293–94 (N.D. Cal. 2025); *see also Smith*, 2025 WL 2097457, at *11 n.101 ("A homeless person's personal property is generally all he owns; therefore, while it may look like 'junk' to some people, its value should not be discounted.") (quoting *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559 (S.D. Fla. 1992)).

First, as addressed in the standing sections for each individual Plaintiff, there are triable issues of material fact as to whether the City abated property belonging to the Individual Plaintiffs.  *See above* Section III.B.1.  Plaintiff Paez has testified that government employees disposed of her medication, identification cards, makeup, and cell phone during an abatement in June 2023.  (Paez Dep. 1 at 135–36); (Paez Dep. 2 at 22).  Plaintiff Anderson has testified that PSET has abated his property at least fifteen times.  (Anderson Dep. at 58); (Mann Dep. Excerpts at 285).  Plaintiff Fobes asserts that, in December 2022, Riverside Police officers towed her truck and threw away everything inside, including clothing, a backpack with school supplies, and her father's ashes.  (JAF 81); (Fobes Dep. at 112, 150–55).  Plaintiffs Bryan and Shawn Yost also testified that the City destroyed all their belongings, including a wallet, personal identification, and jewelry.  (B. Yost Dep. 2 at 2); (S. Yost Dep. at 53, 201).  As such, the Individual Plaintiffs have raised triable issues of material fact as to whether the City actually conducted abatements of their property.

Second, the Court finds that there is a triable issue of material fact as to whether the abated property was abandoned, or whether the Individual Plaintiffs retained possessory property interests over those items.  Plaintiff Fobes testified that Officer Mann, a Riverside City police officer, threw away items stored in her truck, such as clothing and a backpack filled with school supplies during an abatement conducted in December of 2022.  (Fobes

Dep. at 152–54). She also testified that she tried to retrieve her father's ashes during the abatement but was unable to do so. (*Id.* at 112).

Plaintiff Paez testified that property neatly packed on a red wagon was disposed of in its entirety. (Paez Dep. 2 at 8–13). On the date of abatement, Plaintiff Paez packed her things on a red wagon in an effort to remove her belongings from the river bottom. (*Id.* at 9). However, she was unable to roll the wagon out of the levy. She left the river bottom, believing that the individuals conducting the abatement would store her belongings because the items were "neatly . . . packed in [her] wagon." (*Id.* at 3, 13). The items stored on the wagon that were eventually destroyed by RCE Officers included a backpack with a phone, a California ID, makeup, a ten-person tent, and prescription medication. (*Id.* at 16–19, 23).

In a declaration dated January 3, 2025, Plaintiff Jade Anderson states that in March 2024, RCE Officers and Riverside Police officers threw away his property, such as clothes, food, and sleeping bags, even though he requested that they not throw such items away. (Anderson Decl. at 471).

Plaintiff Bryan Yost also testified that during one abatement, Riverside Police officers threw his belongings in a dumpster, despite statements that he "need[ed] to grab some of [his] stuff." (B. Yost Dep. 1 at 138). The evidence suggests that Plaintiff Bryan Yost did not act in such a way as to relinquish a possessory interest in his property—According to him, he stored his wallet, jewelry, and personal keepsakes in a backpack, and moved his property around the riverbed in response to Notices of Pending Removal, even when dates were not included, because he "didn't want to lose [his] belongings." (B. Yost Dep. 1 at 146). Plaintiff Shawn Yost also testified that [the City] threw away "all [his] personal stuff," including a driver's license. (S. Yost Dep. at 53); *see also* (S. Yost Dep. at 201) ("The first major one when they had taken all my stuff, yes, they took my tent that had my personal belongings, I mean, all of my credentials and everything in it and wouldn't let me go back and retrieve it."). In addition, either Plaintiff Shawn Yost or Bryan Yost remained with their belongings at all times and even had dogs guarding their property. (B. Yost Dep. 1 at 148). Based on the foregoing, the Court finds that neither Plaintiffs

Bryan nor Shawn Yost relinquished a possessory interest and abandoned their abated property.

Third, as described below in the Fourteenth Amendment Due Process section, there is a genuine dispute of material fact as to whether Defendants provided proper notice. For example, Plaintiff Bryan Yost testified one such Notice of Pending Removal posted on his tent lacked a date for removal. (B. Yost Dep. 1 at 136). At the very least, this testimony raises a material question of fact as to whether the abatement of Plaintiffs Bryan and Shawn Yost's property specifically was reasonable.

Based on the Individual Plaintiffs' testimony, a reasonable trier of fact could conclude that the property at issue was not abandoned and was improperly seized. Defendants are therefore not entitled to summary judgment on Plaintiffs' Fourth Amendment seizure claim, and the Motion as to that claim is DENIED.

### 2. Fourteenth Amendment: Due Process

Defendants assert that they are entitled to summary judgment on the Individual Plaintiffs' Fourteenth Amendment Due Process claim because they provided advance notice of any abatement of property belonging to Individual Plaintiffs. (Mot. at 42–43). Under *Mathews v. Eldridge* and *Recchia v. City of Los Angeles Dep't of Animal Services*, according to Defendants, Individual Plaintiffs are not entitled to a hearing for contested seizures. (*Id.* (citing *Recchia*, 889 F.3d at 562 (analyzing *Mathews v. Eldridge*, 424 U.S. 319 (1976)))). Defendants also reiterate that Plaintiffs Paez, Fobes, and Anderson lack standing to assert a Fourteenth Amendment claim because they failed to demonstrate their property was taken by the City. (*Id.*).

Plaintiffs respond that the Notice of Pending Removal is facially deficient because it does not identify the property to be seized or the time at which the seizure would occur. (*Id.* at 47–48).[7] According to Plaintiffs, the Notice of Removal does not grant Defendants

---

[7] As part of their response to Defendants' Motion on their Fourteenth Amendment claim, Plaintiffs have not specifically addressed whether the Individual Plaintiffs are entitled to a pre-deprivation hearing but have argued in connection with their *Monell* claim that

an indefinite right to abate property.  (*Id.* at 48).  Plaintiffs also argue that Defendants did not comply with the procedures when conducting abatements.  (*Id.*).

Under the Due Process Clause of the Fourteenth Amendment, unhoused individuals are entitled to "notice and an opportunity to be heard before and after [the state] seizes personal property that belongs to people experiencing homelessness."  *Tyson v. City of San Bernardino*, No. 23-cv-01539-TJH-KK, 2024 WL 3468832, at *5 (C.D. Cal. Jan. 12, 2024) (citing *Lavan*, 693 F.3d at 1032)); *see also Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 981 (N.D. Cal. 2019) (same).  The adequacy of such notice is held to the "reasonably calculated" standard established in *Mullane v. Central Hanover Bank & Trust Co.*, which requires that notice be "reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections . . . with due regard for the practicalities and peculiarities of the case."  339 U.S. 306, 314–15 (1950); *see Grimm v. City of Portland*, 971 F.3d 1060, 1067–68 (9th Cir. 2020) (clarifying that the *Mathews v. Eldridge* analysis "governs the question of whether and when due process requirements, including notice, is required" and *Mullane* "governs adequacy of notice claims").  Courts balance "the interest of the state" and "the individual interest sought to be protected by the Fourteenth Amendment."  *Grimm v. City of Portland*, 125 F.4th 920, 925 (9th Cir. 2025).

When removing or seizing property belonging to unhoused individuals, due process is satisfied when the government "take[s] reasonable steps to give notice" of taken property "so the owner can pursue available remedies for its return."  *Lavan*, 693 F.3d at 1032 (quoting *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999)).  Absent such process, a "practice of on-the-spot destruction of seized property . . . presents an enormous risk of erroneous deprivation" that violates the Fourteenth Amendment.  *Id.* at 1032–33.

Courts in this Circuit have described the contours of procedures sufficient to provide due process in abatement proceedings.  Generally, due process requires the government to

---

Defendants engage in a policy, practice, and custom of immediately destroying property without a pre-deprivation hearing.  *See* (Mot. at 53–54).

provide some advance notice before conducting abatement. In *Sullivan*, the court found that the defendant city provided sufficient due process before an abatement by issuing a written notice seventy-two hours before abatement that explained "who to call or where to go if someone want[ed] to reclaim their property." *Sullivan*, 383 F. Supp. 3d at 982–83. The court rejected an argument that the defendant city was required to "disclose the precise date and time at which it will return to enforce the encampment's removal," because the plaintiffs did not cite evidence establishing that additional specificity in the removal notice "would have prevented the [c]ity's allegedly erroneous seizure of unabandoned property." *Id.* at 982. Similarly, a city that provided notice ten days before commencing abatement, an opportunity to seek a stay of the abatement, and storage of property pending appeal satisfied the Due Process Clause in *Smith*. 2025 WL 2097457, at *11–*12; *see also Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 436 (N.D. Cal. 2017) (finding no Fourth Amendment violation when the City ordinance gave 24-hour notice prior to impounding personal property belonging to unhoused individuals and requiring the impounded property be stored by the City for 90 days before being discarded).

In contrast, courts have held abatement policies that permit the immediate destruction of property without any advance notice violate due process. *E.g. Lavan*, 693 F.3d at 1032–33. The court in *Garcia* held that a statute which permitted immediate destruction of large items on public property "provid[ed] no process at all"; the mere enactment of a municipal ordinance could not be "reasonably calculated" to provide notice of the permanent deprivation of property. *Garcia v. City of Los Angeles*, 481 F. Supp. 3d 1031, 1047–48, 1047 n.24 (C.D. Cal. 2020), *aff'd*, 11 F.4th 1113 (9th Cir. 2021). In addition, a court denied a county's motion for summary judgment on a homeless plaintiff's Fourteenth Amendment claim because the plaintiff stated in a declaration that she did not personally receive any notices of removal, leading to the inference that any notice posted by the government was "not effective to mitigate the risk of an erroneous deprivation." *Sage*, 2024 WL 2941753, at *12.

Here, the Court finds that the policy provided sufficient notice in the removal of property and retrieval of abated property.  The Notice of Pending Removal stated:

> THIS PROPERTY IS LOCATED IN THE CITY OF RIVERSIDE PUBLIC RIGHT-OF-WAY
>
> PURSUANT TO RMC 9.04.400(G); YOU ARE HEARBY ORDERED TO REMOVE ALL OBJECTS, STRUCTURES, PROPERTY, TRASH, DEBRIS, PERSONAL BELONGINGS AND MISCELLANEOUS ITEMS FROM THE RIGHT-OF-WAY.
>
> FAILURE TO DO SO MAY RESULT IN THE PROPERTY BEING CONSIDERED ABANDONED AND REMOVED/DISPOSED OF WITHOUT FURTHER NOTICE.
>
> REMOVAL OF PROPERTY IS REQUIRED BY [two business days after issued notice].

(Mot. at 41); *see also* (ECF No. 175 at 72).

After abatement, the following Notice of Removal was posted:

> NOTICE OF REMOVAL
>
> THE PROPERTY THAT WAS DEPOSITED IN THE CITY OF RIVERSIDE PUBLIC RIGHT-OF-WAY AT THIS LOCATION HAS BEEN REMOVED BY THE CITY PURSUANT TO RMC 9.04.400(G)
>
> THE AFOREMENTIONED PROPERTY WILL BE STORED AT THE FOLLOWING LOCATION: 2880 HULEN PL., RIVERSIDE, CA AND CAN BE RECLAIMED MONDAY THROUGH FRIDAY BETWEEN 1:00 P.M. AND 4:00 P.M.
>
> UNLESS THIS PROPERTY IS CLAIMED BY ITS LEGAL OWNER, THIS PROPERTY WILL BE CONSIDERED ABANDONED AND DISPOSED OF ON OR AFTER THE DATE INDICATED WITHOUT FURTHER NOTICE.
>
> PROPERTY WILL BE DISPOSED OF BY: [DATE].

(ECF No. 175 at 73).

Taken together, these Notices reasonably provided property owners like Individual Plaintiffs notice that their property would be removed and an opportunity to retrieve abated property. The Court finds *Sullivan* persuasive—Defendants have both provided forty-eight hours of advance notice of removal and informed owners of abated property where to retrieve their items, and the Individual Plaintiffs have not demonstrated that additional specificity would have prevented the alleged Fourth Amendment or Fourteenth Amendment violations. *See Sullivan*, 383 F. Supp. 3d at 982–83. Defendants also had an interest in maintaining public health and safety on public property, such as on public sidewalks and public parks. (Mot. at 41). The Court finds that these Notices were facially valid.

The Individual Plaintiffs, however, raise a genuine dispute of material fact as to whether Defendants complied with the procedures when conducting abatements. *See, e.g.*, *Coal. on Homelessness*, 786 F. Supp. 3d at 1295–96 (finding that unhoused plaintiffs presented material dispute of fact in offering deposition testimony that city employees did not properly store unabandoned abated property). In a declaration dated January 3, 2025, Plaintiff Jade Anderson states that in March 2024, RCE Officers and Riverside Police officers threw away his property, such as clothes, food, and sleeping bags, despite being asked not to throw such items away. (Anderson Decl. at 471). He also testifies that his clothing, blankets, ID, bank cards, and seizure medication were taken by RCE Officers and Riverside Police Officers during three separate abatements on or around June 2023, on August 14, 2023, and on or around September 11, 2023. (*Id.* at 471). When Plaintiff Anderson went to the Hulen Access Center to retrieve his belongings, they were not there. (*Id.*).

In addition, Plaintiff Bryan Yost testified that a Notice of Pending Removal for the December 2022 abatement did not include a deadline to remove his or his brother's property. (B. Yost Dep. 1 at 136). However, Officer Mann testified that in the month between providing notice of abatement and the date of abatement, RCE Officers repeatedly

contacted Bryan and Shawn Yost, "[verbally] advising them there would be cleanup going on, and offering services, and trying to get them alternate arrangements before it came to that day." (Mann Dep. Excerpts at 290).

Accordingly, the Court finds there are triable issues of material fact regarding whether Defendants provided advance or adequate notice to the Individual Plaintiffs and whether the Individual Plaintiffs' property was stored at the Hulen Access Center.

### 3.   Fourteenth Amendment: State-Created Danger

The Fourteenth Amendment "generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). One exception to this principle is the state-created danger doctrine, where "the state is constitutionally required to protect a plaintiff that it affirmatively places . . . in danger by acting with deliberate indifference to a known or obvious danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (internal quotation marks and citation omitted). To prevail on a state-created danger claim, Plaintiffs must show that (1) the state actor's "affirmative actions created or exposed her to an actual, particularized danger that she would not otherwise have faced," (2) "the injury she suffered was foreseeable," and (3) the state actor was "deliberately indifferent to the known danger." *Alfred v. City of Vallejo*, No. 2:24-cv-03317-DC-SCR, 2025 WL 435900, at *8 (E.D. Cal. Feb. 7, 2025) (quoting *id.*). A state actor affirmatively places a plaintiff in danger when the actor's "actions create or expose an individual to a danger which he or she would not have otherwise faced." *Langley v. City of San Luis Obispo*, No. 21-cv-07479-CJC-ADS, 2022 WL 18585987, at *5 (C.D. Cal. Feb. 7, 2022) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006)). For this first prong, the inquiry for the Court is "whether the officer [] left the person in a situation that was more dangerous than the one in which they found him." *Kennedy*, 439 F.3d at 1062. Second, the state actor is liable for "creating the foreseeable danger of injury given the particular circumstances." *Martinez*, 943 F.3d at 1273–74 (internal quotation marks and citation omitted). Foreseeability of injury is not limited to

the injury itself. *Id.* As to the third prong, officers act with deliberate indifference when they "disregard[] a known or obvious consequence of [their] action[s]." *Prado v. City of Berkeley*, No. 23-cv-04537-EMC, 2024 WL 3697037, at *28 (N.D. Cal. Aug. 6, 2024) (quoting *Patel*, 648 F.3d at 974); *e.g. Alfred*, 2025 WL 435900, at *9–*10 (finding that a homeless plaintiff plausibly alleged that the city defendant acted with deliberate indifference when it represented that it would not allow plaintiff to move or camp anywhere within the city, and did not connect plaintiff with shelter or housing services). The state-created danger doctrine does not apply when the "dangers in question are generalized dangers inherent to homelessness that are not created by the actions of a state actor." *Hipp v. City of Vallejo*, No. 2:25-cv-01806-DJC-SCR, 2025 WL 2099371, at *5 (E.D. Cal. July 24, 2025).

Defendants' arguments focus on the first prong, asserting that none of the Individual Plaintiffs were exposed to a particularized danger during the course or as a result of any contested abatement. (Mot. at 43). According to Defendants, Plaintiffs Fobes, Bryan Yost, and Shawn Yost are currently housed and not subject to danger from any alleged abatement. (*Id.*). Plaintiffs argue that regardless of whether an Individual Plaintiff is currently housed, Defendants placed Individual Plaintiffs in a more dangerous situation at the time of abatement because they seized essential property, such as tents and medicine. (*Id.* at 49–50). Plaintiffs' evidence sufficiently demonstrates dangers and injuries the Individual Plaintiffs otherwise would not have faced absent abatement, including medical injuries, such as seizures and head traumas, as well as exposure to extreme heat and harsh weather conditions. *See* (*id.* (citing (Anderson Decl. at 469); (Paez Dep. 1 at 135–36))).

However, no parties have addressed whether Defendants were "deliberately indifferent to the known danger." *Martinez*, 943 F.3d at 1271. Based on Plaintiffs' testimony regarding the particularized danger Individual Plaintiffs otherwise would not have faced, the Court declines to grant summary judgment in favor of Defendants on an issue not fully briefed.

1          4.    Qualified Immunity

2    Defendants argue that the City and Defendant Gonzalez are entitled to qualified

3    immunity and, thus, summary judgment should be granted on the Individual Plaintiffs'

4    § 1983 claims. *See* (Mot. at 37–39); (Reply at 6). Plaintiffs oppose, asserting that qualified

5    immunity is only available to individuals sued in their individual capacities and, thus, the

6    City and Defendant Gonzalez cannot avail themselves of the shield. (*Id.* at 39–40). The

7    Court agrees with Plaintiffs.

8    "In § 1983 actions, the doctrine of qualified immunity protects city officials from

9    personal liability in their *individual* capacities for their official conduct so long as that

10   conduct is objectively reasonable and does not violate clearly-established federal rights."

11   *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 964 (9th Cir. 2010) (emphasis in

12   original). A municipality does not enjoy such protection under § 1983—"[a] municipality

13   can be sued under § 1983" and can be held liable if the "municipal policy or custom caused

14   the constitutional injury." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination

15   Unit*, 507 U.S. 163, 166 (1993). Qualified immunity is also "not available to those sued

16   only in their official capacities," *Wright v. Beck*, 981 F.3d 719, 737 (9th Cir. 2020) (citing

17   *Cmty. House, Inc.*, 623 F.3d at 965), because a suit against an individual named in their

18   official capacity is "in all respects other than name, to be treated as a suit against the

19   [government] entity," *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

20   Based on these principles, the doctrine of qualified immunity is inapplicable to

21   Defendants. The City, as a municipal defendant, does not enjoy qualified immunity under

22   § 1983. *See Leatherman*, 507 U.S. at 166. That the Second Amended Complaint alleges

23   that Defendant City is liable "on the basis of the acts of its officials, agents, and employees"

24   does not entitle Defendant City to qualified immunity—"a municipality can be sued under

25   § 1983" and may be held liable under *Monell* if "a municipal policy or custom caused the

26   constitutional injury" alleged. *Id.* Defendant Gonzalez is sued in his official capacity as

27   Chief of the Riverside Police Department, not in his individual capacity, and thus he too

28   may not avail himself of the protection of qualified immunity. *See Cmty. House, Inc.*, 623

F.3d at 965 ("[Qualified immunity] is *not* available to those sued only in their official capacities."). Plaintiffs' case against Defendant Gonzalez is, in effect, a case against the Riverside Police Department. *See Graham*, 473 U.S. at 166. Thus, the Court declines to grant summary judgment on Plaintiff's § 1983 claims based on the doctrine of qualified immunity.

### 5.  *Monell* Liability

Local governing bodies, such as municipalities, and other local government units, can be sued directly under § 1983 when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691; *see Rivera v. Cnty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014) ("[M]unicipalities, including counties and their sheriff's departments, can only be liable under § 1983 if an unconstitutional action 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" (quoting *Monell*, 436 U.S. at 690)).

Municipalities may be subject to *Monell* liability when a plaintiff demonstrates that "an official policy, custom, or pattern on the part of [the] defendant was the actionable cause of the claimed injury." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). "The Supreme Court has made clear that policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, and, in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (internal citations omitted). A failure to discipline may also give rise to *Monell* liability. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

At the motion to dismiss stage, the Court denied Defendants' *Monell* argument because Plaintiffs adequately named him as a defendant in his official capacity, as the Chief of the Riverside Police Department. (MTD Order at 10). The operative complaint at the time adequately alleged that Defendant Gonzalez was the individual responsible for the

administration and operation of the Riverside Police Department and that he, in his official capacity, was responsible for, expressly approving, or ratifying threats of arrest made by Riverside Police Officers to Individual Plaintiffs when requesting to remove property during abatement.  (*Id.*).

Plaintiffs now argue that "[t]he City's practice is to provide individuals with ineffective notice prior to abatements by noting a date for encampment abatement, then returning days or weeks later." (Mot. at 53).  Plaintiffs also present evidence, which they argue shows that the City's policies and practice permit PSET Code Enforcement Officers to "summarily destroy property" without a hearing and without an opportunity to reclaim their belongings and does not discipline Code Enforcement for these alleged constitutional violations.  (*Id.* at 54).  Defendants counter that Plaintiffs have not established a practice, policy or procedure that caused any constitutional violation.  (*Id.* at 45).  Defendants also argue that any City policies, practices, customs, training, or supervision "do not condone and are not deliberately indifferent to the violation of state or Constitution or other protected rights." (*Id.*).  The Court evaluates these arguments.

a)    <i>Policy, Custom, or Practice</i>

Plaintiffs identify three customs that "constitute[] the standing operating procedure" of the City: that the City's practice is to provide individuals with ineffective notice; that Code Enforcement is permitted to destroy property without a pre-deprivation hearing or opportunity to reclaim that property; and that property is destroyed based on an employee's subjective opinion on whether the property has value.  (*Id.* at 53–54).

As discussed above, there is a genuine dispute of material fact regarding whether the City's abatement of property belonging to the Individual Plaintiff's comported with the Fourth Amendment.  This is sufficient to create triable issues as to whether the City has a custom or practice of violating the Fourth Amendment.  *See Coal. on Homelessness*, 786 F. Supp. 3d at 1296–97 (declining to grant summary judgment on homeless plaintiffs' *Monell* claim challenging the city's abatement procedure because there was "dispute of

1    triable fact as to whether the City's seizure of property comported with the Fourth

2    Amendment").

3                                b)    *Failure to Discipline*

4            When a plaintiff asserts a claim under *Monell* premised on a "failure to act," such as

5    a failure to discipline, there must be evidence that "the municipality exhibited deliberate

6    indifference to the violation of [the plaintiff's] federally protected rights."  *Hyun Ju Park*

7    *v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020); *e.g. Mendoza v. City of*

8    *Los Angeles*, No. 21-cv-4614-KS, 2022 WL 19837951, at *13 (C.D. Cal. Dec. 14, 2022)

9    (granting summary judgment in favor of the city for a *Monell* "failure to train" claim

10   because plaintiffs failed to "put forth evidence of Defendant City's deliberate

11   indifference").  Deliberate indifference is "a stringent standard of fault, requiring proof that

12   a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of Cnty.*

13   *Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).  To show deliberate

14   indifference, plaintiffs must show that "the municipality was on actual or constructive

15   notice that its failure to act is likely to result in the violation of constitutional rights."

16   *Mendoza*, 2022 WL 19837951, at *13 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378,

17   390 (1989)).

18           Plaintiffs have not demonstrated a genuine dispute of material fact that Defendants

19   acted with deliberate indifference.  Plaintiffs only point to testimony by Deanna McDonald,

20   a Senior Code Enforcement Officer with the City, to show that no Code Enforcement

21   Officer has been disciplined for improperly causing property to be destroyed or taken from

22   a person in an encampment.  *See* (Mot. at 54); (ECF No. 176, Ex. 198 ("McDonald Dep.

23   Excerpts") at 330); (ECF No. 143-1 at 20).  This testimony, on its own, is insufficient to

24   create a triable issue of fact to establish actual or constructive notice that the code

25   enforcement officials acted in such a way as to be "substantially certain" to violate the

26   Fourth and Fourteenth Amendment rights of Individual Plaintiffs.

27           Accordingly, Defendants are entitled to summary judgment on the Individual

28   Plaintiffs' second *Monell* theory for failure to discipline.

### D.    Claims 4, 5, and 6: Disability Discrimination

"A disability discrimination claim may be based on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Payan v. Los Angeles Cmty. Coll Dist.*, 11 F.4th 729, 738 (9th Cir. 2021).

Plaintiffs raise a disparate impact and disparate treatment challenge to the City's abatement policy. Plaintiffs argue the policy, though facially neutral, has both a disparate impact on individuals with disabilities and discriminates against each of the Individual Plaintiffs on the basis of his or her disability. (Mot. at 50–52, 58–59). Defendants counter that Plaintiffs' disability discrimination claims fail as a matter of law. According to Defendants, PSET does not receive federal or state funds and is, instead, locally funded by a municipal sales tax measure, meaning that the claims under the Rehabilitation Act and Cal. Gov. Code § 11135 cannot prevail. (*Id.* at 53–55). Defendants also reiterate their standing arguments, asserting that no Individual Plaintiff is disabled, as defined by the ADA, Rehabilitation Act, or Cal. Gov. Code § 11135. (*Id.* at 44). Because the legal framework for Plaintiffs' disability discrimination claims is substantially similar, the Court first addresses the applicable statutes and then turns to Plaintiffs' disparate treatment and disparate impact claims.

#### 1.    Statutory Framework

Title II of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act, and Cal. Gov. Code § 11135 all prohibit publicly funded programs and activities from discriminating on the basis of disability.

Title II of the ADA "bars municipalities from discriminating against qualified individuals with disabilities when providing services, programs, or activities." *S.G. v. City of Los Angeles*, No. 17-cv-09003-JAK-PJW, 2021 WL 911254, at *9 (C.D. Cal. Feb. 4, 2021). Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To comply with this directive, "[a] public entity must make

reasonable modifications to avoid discrimination against persons with disabilities, unless it can demonstrate that doing so would fundamentally alter the nature of the service, program, or activity it provides." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014).

Similarly, the Rehabilitation Act "prohibits a program receiving federal financial assistance from discriminating based on a disability." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 650 (9th Cir. 2021) (citing 29 U.S.C. § 794(a)); *see also Weinreich v. L.A. Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act."); *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act."). Programs that receive federal funding may not discriminate based on disability. 29 U.S.C. § 794.

Finally, Cal. Gov. Code § 11135 provides that "[n]o person in the State of California shall, on the basis of . . . mental disability [or] physical disability . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Cal. Gov. Code § 11135(a). Section 11135 expressly incorporates Title II by reference, except where state law prescribes stronger protections, and bars programs that receive state funding from discriminating against individuals with disabilities. *Id.* § 11135(b). In other words, "Title II provides a floor and not a ceiling for the scope of section 11135 protections and prohibitions." *Sharkey v. O'Neal*, 778 F.3d 767, 773 (9th Cir. 2015).

As relevant to this Motion, Section 504 of the Rehabilitation Act and Cal. Gov. Code § 11135 may be distinguished by each program's source of funding. *See* 29 U.S.C. § 794; Cal. Gov. Code § 11135. Section 504 of the Rehabilitation Act applies to programs that receive federal funds, and Cal. Gov. Code § 11135 applies to programs that receive

California state funds.  29 U.S.C. § 794; Cal. Gov. Code § 11135.  Defendants argue that Claims 5 and 6 under section 504 and Cal. Gov. Code § 11135, respectively, fail as a matter of law because PSET is funded solely by Measure Z, a municipal tax measure.

### a)    Applicability of Section 504 of the Rehabilitation Act

Defendants argue Individual Plaintiffs' Rehabilitation Act claim fails as a matter of law because PSET is funded by Measure Z, a municipal sales tax, and does not receive federal funds.  (Mot. at 44); (Reply at 6).  Plaintiffs argue that, not only does PSET receive federal funding, but also that the departments that administer PSET receive federal funding, thus making the City subject to Section 504.  (Mot. at 53).

"Whether a particular state entity is a program or activity receiving federal financial assistance within the meaning of section 504, though itself 'a question of federal law, . . . can be answered only after considering the provisions of state law that define the agency's character.'"  *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009) (quoting *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 n.5 (1997)).  Federal financial assistance may be direct or indirect, so long as the program or activity is the intended recipient, and not simply a beneficiary.  *Id.* at 1181; *see also T.L. ex rel. Lowry v. Sherwood Charter Sch.*, 68 F. Supp. 3d 1295, 1326–29 (D. Or. 2014), *aff'd sub nom. Lowry v. Sherwood Charter Sch.*, 691 F. App'x 310 (9th Cir. 2017) (finding at summary judgment that plaintiff did not demonstrate that charter school received federal funding for the fiscal year when the actionable conduct occurred).

The Court finds Plaintiffs have not raised a genuine dispute of material fact that PSET was the intended beneficiary of federal financial assistance.  From the Court's review of Plaintiffs' identified exhibits, Plaintiff have not shown that, during the time frame of the abatements at issue, PSET or Code Enforcement was receiving federal funds.  *See* (Mot. at 53 (citing (ECF No. 175-1, Ex. 183 ("City Net PSET Consultant Services Agreement"), (ECF No. 175-2, Ex. 193), (ECF No. 176, Exs. 217, 218, 219, 221)).  In support of their assertion that PSET receives federal funds, Plaintiffs submit Exhibit 183, a Consultant Services Agreement between the City and City Net, a City subcontractor.  *See* (*id.*).  The

Agreement provides that the City engaged City Net with funds from the federal Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and State of California Budget Act of 2020 between at least August 30, 2020, and January 23, 2021. (City Net PSET Consultant Services Agreement at 89). Defendants' contested conduct, however, began in October 2022, well after the time frame identified by the Individual Plaintiffs and upon enactment of the Riverside municipal codes that provided the funding sources for PSET. (SAC ¶ 9). Plaintiffs have not pointed the Court to other points in the record demonstrating that PSET received federal funds during the timeframe of the contested abatements. Nor have Plaintiffs asserted that PSET was the intended recipient of federal funds, rather than a mere beneficiary. *Compare T.L. ex rel. Lowry*, 68 F. Supp. 3d at 1328–29. The Court therefore GRANTS summary judgment in favor of Defendants on Individual Plaintiffs' Rehabilitative Act claim.

### b)    Applicability of Cal. Gov. Code § 11135

Defendants argue that summary judgment should be granted on the Individual Plaintiffs' § 11135 claim because PSET does not receive state funding. (Mot. at 44). Plaintiffs counter that the City receives state funding for the Santa Ana Riverbottom Response operations. (*Id.* at 59).

The Court finds that PSET receives state funds. Plaintiff's identified exhibit, Exhibit 197, is an agreement between the City and County of Riverside to respond to homeless encampments at the Santa Ana River Bottom between February 1, 2023, and June 30, 2025. (ECF No. 176, Ex. 197 ("HWS SAR Response") at 297–98). Clause 5, "Availability of Funds/Non-Appropriation of Funds," provides that the "Agreement is valid and enforceable only if sufficient funds are made available to [the County of Riverside] by BCHS." (*Id.*). "BCHS" is defined in Clause 1.A as the "State of California, Business Consumer Services and Housing Agency." (*Id.* at 297). Based on this exhibit, Individual Plaintiffs have established that PSET receives state funding during the period of actionable conduct. The Court therefore declines to grant summary judgment in favor of Defendants on this basis.

1          1.      Disparate Treatment

2    Having determined that the City's abatement practices are subject to Title II of the

3    ADA and Cal. Gov. Code § 11135, the Court turns to Plaintiffs' argument that the City

4    impermissibly discriminates against disabled individuals when administering encampment

5    abatement.   *See* (Mot. at 51–52).   As Section 11135 expressly incorporates Title II,

6    including the ADA's definition of disability, the Court will address these claims in tandem.

7    *See* Cal. Gov. Code § 11135(b); *Bassilios v. City of Torrance, CA*, 166 F. Supp. 3d 1061,

8    1084 (C.D. Cal. 2015) (Section 11135 is "coextensive with the ADA because it

9    incorporates the protections and prohibitions of the ADA and its implementing

10   regulations.").

11   "To prevail under Title II, the plaintiff must show that: (1) he is a qualified individual

12   with a disability; (2) he was either excluded from participation in or denied the benefits of

13   a public entity's services, programs, or activities, or was otherwise discriminated against

14   by the public entity; and (3) this exclusion, denial, or discrimination was by reason of his

15   disability."  *Cohen*, 754 F.3d at 695.

16   Defendants argue that summary judgment should be granted on the Individual

17   Plaintiffs' disability claims because none of the Individual Plaintiffs are disabled under the

18   ADA or Section 11135.  Defendants also argue that an abatement is not a program, and

19   thus Plaintiffs were not denied any benefit.  (Reply at 6–7).

20          a)      *Qualified Individual with a Disability*

21   "Disability" is a term of art which, as statutorily defined, does not require diagnosis

22   by a medical professional.  *Socal Recovery, LLC v. City of Costa Mesa*, 56 F.4th 802, 815

23   (9th Cir. 2023), *cert. denied sub nom. City of Costa Mesa, California v. SoCal Recovery,*

24   *LLC*, 144 S. Ct. 422 (2023) ("We have held that plaintiffs may establish an actual disability

25   through non-medical evidence."); *see also Est. of Chivrell v. City of Arcata*, No. 22-cv-

26   00019-HSG, 2025 WL 2210020, at *9 (N.D. Cal. Aug. 4, 2025) ("[T]he text of the ADA

27   does not require that a person be diagnosed with, or receive medical treatment for, a

28   qualifying disability to show that he has one."); *Sanders v. Arneson Prods., Inc.*, 91 F.3d

1351, 1354 n.2 (9th Cir. 1996) ("A person may be 'disabled' in the ordinary usage sense, or even for purposes of receiving disability benefits from the government, yet still not be 'disabled' under the ADA"). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). At summary judgment, a plaintiff's testimony is sufficient to establish a genuine issue of material fact if the testimony "contain[s] sufficient detail to convey the existence of an impairment" of a major life activity. *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 858–59 (9th Cir. 2009). "[C]ontested issues of material fact as to whether [plaintiff] is disabled under the ADA . . . is thus best left to the jury." *Core v. Casino Ctr., LLC*, No. 20-cv-462-DSF-AGR, 2020 WL 10503190, at *4 (C.D. Cal. Dec. 22, 2020).

The Court finds that under the ADA and Cal. Gov. Code § 11135, (1) Plaintiff Fobes is disabled; (2) there is a genuine dispute of material fact whether Plaintiffs Anderson and Bryan Yost are disabled; and (3) Individual Plaintiffs Paez and Shawn Yost have not raised a genuine dispute of material fact that they are disabled.

First, the Court finds that Plaintiff Fobes qualifies as disabled under the ADA and thus under Cal. Gov. Code § 11135. *See Bassilios*, 166 F. Supp. 3d at 1084. Plaintiff Fobes was diagnosed with cervical myelopathy in December of 2022, a spinal issue that renders her unable to walk, necessitating use of a wheelchair. (Fobes Dep. at 95, 149–50, 154). The Ninth Circuit has found that a person who uses a wheelchair for mobility qualifies as disabled for ADA purposes. *See Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 984 (9th Cir. 2014); *Munoz v. Cnty. of Los Angeles*, 558 F. Supp. 3d 845 (C.D. Cal. 2021). The inability to walk substantially limits major life activities, and thus, Plaintiff Fobes is disabled under the ADA.

1    Second, the Court finds a triable issue of fact exists regarding whether Individual

2    Plaintiffs Anderson and Bryan Yost are disabled under the ADA and Cal. Gov. Code

3    § 11135.  Plaintiff Anderson regularly experiences seizures and has had at least nine in

4    2023.  (Anderson Dep. at 12, 17).  Plaintiff Anderson testified during his deposition that

5    the DMV revoked his driver's license because of these seizures.  (*Id.* at 12).  A reasonable

6    fact finder could determine, based on that testimony that the seizures substantially limit

7    one or more major life activities such that Plaintiff Anderson is an "an individual with a

8    disability" under the ADA and Cal. Gov. Code § 11135.  *See Wiggins v. Cnty. of Riverside*,

9    No. 5:24-cv-02405-SVW-DTB, 2025 WL 2005481, at *10 (C.D. Cal. June 9, 2025)

10   (recognizing that a plaintiff who experienced seizures was a qualified individual with a

11   disability); *cf. Greer v. Cnty. of San Diego*, No. 3:19-cv-0378-GPC-AGS, 2019 WL

12   5453955, at *12 (S.D. Cal. Oct. 24, 2019) (collecting cases where courts found that "a

13   seizure disorder alone may not be enough to qualify as disability under the ADA").  As for

14   Plaintiff Bryan Yost, he testified that he has "extreme anxiety" and has moments where he

15   "can't breathe."  (B. Yost Dep. 1 at 92–93).  When he experiences an anxiety attack, he

16   tends to "run away" and is unable to speak with others.  In these instances, his brother

17   Shawn Yost handles social interactions for him.  (B. Yost Dep. 2 at 12, 64).  The Court

18   finds that Plaintiff Bryan Yost has raised a genuine dispute of material fact that his extreme

19   anxiety substantially limits his ability to communicate, a statutorily defined major life

20   activity, and could be considered disabled under the ADA.  *See* 42 U.S.C. § 12102(2)(A).

21   Third, the Court finds that Plaintiffs Shawn Yost and Paez have not provided

22   sufficient evidence to raise a triable issue of material fact regarding whether they are

23   disabled under the ADA and Cal. Gov. Code § 11135.  Plaintiff Shawn Yost testified that

24   he "can't stand for long periods of time" and has "a hard time doing normal tasks," such

25   as pushing a mower for his landscape business.  (S. Yost Dep. at 26–27).  With just this

26   testimony, the Court finds that Plaintiff Shawn Yost has not put forth "sufficient detail to

27   convey the existence of an impairment" of a major life activity."  *Rohr*, 555 F.3d at 858–

28   59.  Similarly, Plaintiff Paez testified that she gets "winded or nauseous" when she walks.

-46-

1    Without more, Plaintiff Paez has failed to provide sufficient evidence to demonstrate that
2    her shortness of breath substantially limits a major life activity.

3         In sum, the Court GRANTS summary judgment in favor of Defendants as to
4    Individual Plaintiff Paez's and Shawn Yost's disability claims.  The Court finds, however,
5    that Plaintiff Fobes is disabled under the ADA and Cal. Gov. Code § 11135 and that
6    Plaintiffs Anderson and Bryan Yost have raised genuine disputes of material fact regarding
7    whether they are disabled under the ADA and Cal. Gov. Code § 11135.

8                        b)    *Denied Benefits*

9         To satisfy the second prong of the prima facie case for disability discrimination,
10   plaintiffs bear the burden to show that they are "either excluded from participation in or
11   denied the benefits of the public entity's services, programs, or activities, or was otherwise
12   discriminated against by the public entity."  *Smith v. City of Oakland*, No. 19-cv-05398-
13   JST, 2025 WL 2444450, at *3 (N.D. Cal. Aug. 25, 2025) (citing *McGary v. City of
14   Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004)).

15        The Ninth Circuit has explicitly held that municipal code enforcement and activities,
16   such as an abatement, "fall squarely within the type of public activities covered by Title II
17   of the ADA."  *McGary*, 386 F.3d at 1268–69.  In *McGary*, the Ninth Circuit held that a
18   disabled plaintiff adequately alleged that the city failed to reasonably accommodate the
19   plaintiff's disability when conducting an abatement by denying the benefit of "sufficient
20   time to comply with the [c]ity's code enforcement activities in a manner consistent with
21   his disability."  *Id.* at 1269–70.  As it is axiomatic that the "ADA must be construed broadly
22   in order to effectively implement the ADA's fundamental purpose of providing a clear and
23   comprehensive national mandate for the elimination of discrimination against individuals
24   with disabilities," this Court finds that the City must conduct abatements in accordance
25   with the ADA and Cal. Gov. Code § 11135.  *Barden v. City of Sacramento*, 292 F.3d 1073,
26   1077 (9th Cir. 2002).  The Court therefore denies the Motion as to the Individual Plaintiffs'
27   ADA and Cal. Gov. Code § 11135 claims insofar as they argue that the abatement is a non-
28   government program.

*c)*        *By Reason of a Disability*

Finally, for their prima facie cases under ADA and Cal. Gov. Code § 11135, Individual Plaintiffs must show they were denied the benefits of the abatement service "by reason of [their] disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).

Defendants have not contested this prong. Therefore, the Court declines to grant summary judgment in favor of Defendants for Plaintiffs Fobes, Anderson, and Bryan Yost on their ADA and Cal. Gov. Code § 11135 claims. The Court GRANTS summary judgment in favor of Defendants on Plaintiffs Paez's and Shawn Yost's claims for failing to demonstrate that they have a disability.

2.        Disparate Impact

The Court next turns to the Individual Plaintiffs' disparate impact claims under the ADA and section 11135, which the Court addresses together because section 11135 is "coextensive with the ADA." *Bassilios*, 166 F. Supp. 3d at 1084. "To assert a disparate impact claim, a plaintiff must allege that a facially neutral government policy or practice has the effect of denying meaningful access to public services to people with disabilities." *Payan*, 11 F.4th at 738. Upon showing the prima facie elements of an ADA Title II disparate impact discrimination claim, "the public entity is required to make reasonable modifications to its practices or procedures" to "improve systemic accessibility." *Id.* at 738–39; *Smith*, 2025 WL 2444450, at *5. Whether a modification is reasonable is a fact specific inquiry. *Crowder v. Kitagawa*, 81 F.3d 1480, 1485–86 (9th Cir. 1996). "On summary judgment, when the plaintiff produces evidence that a reasonable accommodation is possible, the burden then shifts to the defendant to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Smith*, 2025 WL 2444450, at *5 (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 402 (2005)).

Plaintiffs argue that (1) the City denies disabled individuals "the benefit of the opportunity to comply with the City's [abatement] directives in a manner consistent with their disabilities" and that (2) the City failed to train PSET and Code Enforcement

employees regarding the ADA and reasonable accommodations to be provided. (Mot. at 51–52, 58). Plaintiffs provide evidence that City programs and the Riverside Police Department do not provide systemic training under the ADA to ensure that abatements and PSET employees do not discriminate against individuals with disabilities. *See, e.g.*, (ECF No. 175-2, Ex. 190 at 110 (Officer Sabeh has never had training "specific to disabilities")).

Defendants, for their part, have only objected to Plaintiffs' prima facie case and have not addressed Plaintiffs' disparate impact claim.

Therefore, the Court DENIES Defendants' Motion for Summary Judgment on this ground and finds that Individual Plaintiffs Fobes, Anderson, and Bryan Yost have raised a genuine dispute of material fact regarding whether providing systemic training to ensure that PSET's program implementation does not discriminate against individuals with disabilities is a reasonable accommodation. Since the Court finds that Individual Plaintiffs Paez and Yost are not disabled under the ADA and Cal. Gov. Code § 11135, the Court GRANTS summary judgment in favor of Defendants on their disparate impact claims.

### E. Claim 7: Bane Act

Under the Tom Bane Civil Rights Act ("Bane Act"), Cal. Civ. Code § 52.1, a plaintiff may bring a civil action if their exercise or enjoyment of rights secured by the federal Constitution, California Constitution or other federal or state laws is interfered with by another person through use of threats, intimidation, or coercion. Cal. Civ. Code § 52.1(b)–(c); *see also Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) ("The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation, or coercion."). To prevail on a Bane Act claim, a plaintiff must prove (1) a violation of a constitutional or statutory right; (2) by intimidation, threats, or coercion. *Hernandez v. City of Los Angeles*, No. 2:19-cv-00441-CAS-GJS, 2021 WL 8820856, at *14 (C.D. Cal. Dec. 24, 2021) (citing *Venegas v. Cnty. of Los Angeles*, 153 Cal. App. 4th 1230, 1242 (2007)). If a plaintiff asserts a claim under the Bane Act based on a negligent

violation of their constitutional rights, as Plaintiffs have done so here, they must also "allege coercion independent from the coercion inherent in the [constitutional] violation itself." *Garcia v. City of Los Angeles*, 611 F. Supp. 3d 918, 938 (C.D. Cal. 2020) (citing *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 519 (9th Cir. 2018), *cert. denied sub nom. Cty. of Sonoma, California v. Sandoval*, 140 S. Ct. 142 (2019)); *see* (Mot. at 45).

"[C]oercion inherent in a Fourth Amendment violation could support a Bane Act claim if the coercion occurred with specific intent to violate" a plaintiff's constitutional right. *Sandoval*, 912 F.3d at 519–20. The specific intent inquiry for a Bane Act claim is focused on two questions: First, "[i]s the right at issue clearly delineated and plainly applicable under the circumstances of the case," and second, "[d]id the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right?" *Id.* at 520. For example, in *Sandoval*, the Ninth Circuit held that municipal officers who impounded a vehicle pursuant to a California state statute did not violate a clearly delineated and plainly applicable right. *Id.* at 519. Though the "right to be free from warrantless seizures of personal property" under the Fourth Amendment is undisputed, it was legally unclear that the impoundment was a "seizure" because the officers acted under the color of state law. *Id.* Since the right was not clearly delineated, the officers did not act with the requisite specific intent when seizing the plaintiffs' vehicles. *Id.*

Here, the Court has found there are triable issues of fact on the Individual Plaintiffs' Fourth Amendment and Fourteenth Amendment claims. *See above* Section III.C.1–2. A court has previously found that police threats to an unhoused individual when conducting an abatement could give rise to a Bane Act claim. *See Garcia*, 611 F. Supp. 3d at 938–39. However, as Defendants argue, the Individual Plaintiffs have not demonstrated a triable issue of fact exists on the second prong of the analysis: whether Defendants' disputed violations were conducted with the specific intent to intimidate, threaten, or coerce. *See* (Mot. at 56–57). Plaintiffs only argue that they are not required to establish specific intent. (*Id.* at 59). Based on the Ninth Circuit's analysis of the Bane Act in *Sandoval*, however,

1    Plaintiffs needed to point to evidence demonstrating the requisite intent to assert a Bane
2    Act claim based on a negligent violation of their constitutional rights.  *See also Sage*, 2024
3    WL 2941753, at *14 (granting summary judgment on a Bane Act claim because a homeless
4    plaintiff did not prove that government officials acted with specific intent to violate her
5    Fourth Amendment rights when seizing her personal property).

6         Therefore, the Court GRANTS summary judgment in favor of Defendants on the
7    Individual Plaintiffs' Bane Act claim.

8         **F.    Claim 8: Cal. Civ. Code § 2080 *et seq.***

9         Defendants assert both procedural and substantive arguments in favor of summary
10   judgment on the Individual Plaintiffs' Cal. Civ. Code § 2080 claim.

11        Defendants argue that the Individual Plaintiffs are barred from asserting a claim
12   under § 2080 because they did not timely file tort claims under the California Tort Claims
13   Act seeking damages for property destruction.  (Mot. at 32).  For example, Defendants
14   argue that Plaintiff Anderson never filed a tort claim under the Act, and therefore lacks
15   standing to assert claims under the Bane Act and Cal. Civ. Code § 2080 *et seq.*  (*Id.* at 34).
16   The Court has previously held that Individual Plaintiffs Melinda Fobes, Bryan Yost, and
17   Shawn Yost have substantially complied with the requirements of the California Tort
18   Claims Act and thus have standing to assert such a claim.  *See* (MTD Order at 13).
19   Moreover, Defendants have admitted that at least some of the Individual Plaintiffs' claims
20   are timely and correctly filed with the Defendant entity, and Defendants would not be
21   prejudiced because all claims allege substantially similar conduct, meaning that the
22   Defendant entity had sufficient information to conduct an adequate investigation for both
23   the timely and untimely claims.  (*Id.*); *see Carlino v. Los Angeles County Flood Control
24   Dist.*, 10 Cal. App. 4th 1526, 1534 (1992) ("If a claim satisfies the purposes of the claims
25   statutes without prejudice to the government, substantial compliance will be found.").

26        Turning to the merits of the Individual Plaintiffs' claim under section 2080:
27   Defendants argue that the City properly abated property belonging to the Individual
28   Plaintiffs.  As described above, however, triable issues of fact exist regarding whether

Defendants properly abated property belonging to the Individual Plaintiffs, and whether
that property was abandoned at the time of abatement. *See above* Section III.C.1. Further,
the Individual Plaintiffs have raised a genuine dispute of material fact regarding whether
Defendants properly stored abated property in accordance with section 2080. Cal. Civ.
Code § 2080.10 provides,

> When a public agency obtains possession of personal property from a person
> for temporary safekeeping, the public agency shall . . . [t]ake responsibility
> for the storage, documentation, and disposition of the property [and] [p]rovide
> the person from whom the property was taken with a receipt and instructions
> for the retrieval of the property . . . [including] that the property must be
> claimed within 60 days after the public agency obtains possession or the
> property will be disposed of.

Cal. Civ. Code § 2080.10.

Section 2080.10 specifically applies to property belonging to unhoused individuals.
*See Garcia*, 611 F. Supp. 3d at 940–41 (analyzing legislative history of section 2080.10).
As such, courts have held that section 2080 "imposes a mandatory duty on a public agency
[that] obtains possession of personal property from a person for temporary safekeeping" to
"[t]ake responsibility for the storage, documentation, and disposition of the property" for
60 days." *Id.* at 937; *see also Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1016
(C.D. Cal. 2011) (finding that the city's conduct of destroying unhoused individual's
unabandoned property "rather than holding it pursuant to Cal. Civ. Code § 2080.6 turns
what could be an otherwise lawful seizure into an unlawful one by forever depriving an
owner of his or her interests in possessing the property without recourse, in violation of
§ 2080").

Plaintiffs have presented evidence that the system identifying the items stored and
the owner of the items was not in place in 2022. *See* (McDonald Dep. Excerpts at 328–
29). Plaintiffs have also provided testimony that when the Individual Plaintiffs went to the
Hulen Access Center to retrieve their abated belongings, their belongings were not there.

(Paez Dep. 2 at 40 (testifying that in July 2023, Plaintiff Paez went with Plaintiff Shawn Yost to the Hulen Access Center two weeks after abatement, her belongings were not there, and "when stuff like that was getting picked up, they weren't even worried about putting no names")); (S. Yost Dep. at 210 (same)); (ECF No. 174-2, Ex. 172 ("Chagolla Dep. 2") at 20–21 (testifying that he went with Plaintiff Anderson to the Hulen Access Center to retrieve abated property, but nothing was there)). Therefore, there is genuine dispute of material fact regarding whether Defendants stored Plaintiffs' abated property in accordance with section 2080. The Court therefore declines to grant summary judgment in favor of Defendants on this claim.

### G. Discretionary Immunity

Defendants argue that discretionary immunity applies to all state law claims because PSET employees engaged in discretionary decision making when abating and storing property. Plaintiffs argue that this decision making is the implementation of existing policy, rather than a protected policy judgment, rendering discretionary immunity inapplicable.

California public employees enjoy discretionary immunity under Cal. Gov. Code § 820.2 and are "not liable for an injury resulting from [their] act or omission where the act or omission was the result of the exercise vested in [them], whether or not such discretion be abused." Cal. Gov. Code § 820.2. "Discretion" is not a literal interpretation; "the focus should be on the policy considerations underlying the governmental entity's claim of immunity." *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1160–61 (9th Cir. 2019). The government has the burden to establish that this immunity applies. *Bakos v. Roach*, 108 Cal. App. 5th 390, 400 (2025), *reh'g denied* (Feb. 20, 2025), *review denied* (Apr. 30, 2025) (citing *Johnson v. State of California*, 69 Cal. 2d 782, 794 n.8 (1968)).

"A finding of immunity requires a showing that the specific conduct giving rise to the suit involved an *actual* exercise of discretion, i.e., a conscious balancing of risks and advantages." *Steinle*, 919 F.3d at 1161 (citing *Caldwell v. Montoya*, 10 Cal. 4th 972, 983 (1995)). "[I]mmunity applies only to deliberate and considered policy decisions, in which

a "[conscious] balancing [of] risks and advantages . . . took place.  The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision." *Caldwell*, 10 Cal. 4th at 981 (citing *Johnson*, 69 Cal. 2d at 794 n.8); *see Garcia*, 611 F. Supp. 3d at 936–37 (holding that city police officers were not entitled to discretionary immunity on an unhoused plaintiff's Cal. Civ. Code § 2080 claim).  For example, the Ninth Circuit in *Recchia* affirmed a finding of discretionary immunity for officers who seized pigeons belonging to an unhoused plaintiff because the officers had discretionary authority to "mak[e] assessments of the situation and the relevant considerations and dangers in determining the best outcome" when acting under California Penal Code § 597.1(a)(1).  889 F.3d at 563–64.

However, "Government Code immunities extend only to tort actions that seek money damages." *Schooler v. State of California*, 85 Cal. App. 4th 1004, 1013 (2000); *see also Garcia*, 611 F. Supp. 3d at 936 (same).  Therefore, the Court only considers discretionary immunity in the context of the Individual Plaintiffs' section 2080 claim.

As described above, Cal. Civ. Code § 2080 imposes a mandatory duty that a public agency in possession of "personal property from a person for temporary safekeeping" must store that property for 60 days.  Unlike a statute like California Penal Code § 597.1(a)(1), where police officers are permitted to make individualized assessments for animal seizures, section 2080 does not permit such discretion.  *See Garcia*, 611 F. Supp. 3d at 936 ("T]here is no question that Section 2080.10 imposes a mandatory duty on 'a public agency that obtains possession of personal property from a person for temporary safekeeping' to 'take responsibility for the storage, documentation, and disposition of the property' for 60 days." (quoting Cal. Civ. Code § 2080.10)).  Defendants have therefore not shown they are entitled to discretionary immunity on the Individual Plaintiffs' section 2080 claim.[8]

---

[8] Defendants also argue that the City is required to abate pursuant to Governor Gavin Newsom's statements regarding an executive order that was passed on July 25, 2024. (Mot. at 63).  Neither the executive order nor the Governor's statements have been submitted to

### H.    Requested Relief

Lastly, Defendants request the Court strike the Individual Plaintiffs' requests for injunctive and declaratory relief, as well as for punitive damages and attorney's fees, because "there is no evidence Defendants acted with malice, oppression, or reckless disregard. (Mot. at 64).  Plaintiffs oppose this request.  (*Id.*).

The Court declines to grant Defendants' request.  First, Plaintiffs have raised genuine disputes of material fact regarding Defendants' actions during abatement proceedings, thus supporting their requested relief for injunctive and declaratory relief.  Second, based on these genuine disputes of material fact, the Court declines to grant summary judgment on Plaintiffs' Section 1983 claims, making Plaintiffs' request for attorney's fees appropriate.  *See Cabrera v. Martin*, 973 F.2d 735, 741 (9th Cir. 1992) ("Section 1988 provides for [attorney's] fee awards to plaintiffs who successfully vindicate their rights under, *inter alia*, 42 U.S.C. § 1983).  Third, Defendants' request to strike is premised on their prevailing on their standing arguments.  The cited case, *McQuillion v. Schartzenegger*, recognizes that plaintiffs cannot recover damages if they lack standing; it does speak to the relevant issues before the Court.  (Mot. at 64 (citing 369 F.3d 1091, 1095 (9th Cir. 2004))).   Though punitive damages are not recoverable against municipal defendants, *see generally White v. Washington Pub. Power Supply Sys.*, 692 F.2d 1286, 1290 (9th Cir. 1982), as the issue has not been briefed on the merits, the Court declines to strike any claim for punitive damages requested in the SAC at this juncture.  Defendants' request to strike Plaintiffs' prayer for relief is therefore denied.

### IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS, IN PART, and DENIES, IN PART, Defendants' Motion for Summary Judgment as follows:

- GRANTED as to Plaintiff RAOUON for lack of standing;

---

this Court.  *See* (JAE).  Given the absence of these asserted statements in the factual record, the Court declines to address this argument.

- GRANTED as to Plaintiffs Paez and Shawn Yost's disability claims for lack of standing;
- DENIED as to Individual Plaintiffs first claim of Fourth Amendment unreasonable property seizure;
- DENIED as to Individual Plaintiffs' second claim of Fourteenth Amendment denial of due process;
- DENIED as to Individual Plaintiffs' third claim of Fourteenth Amendment state created danger;
- DENIED as to Plaintiffs Fobes, Anderson, and Bryan Yost's fourth claim under Title II of the ADA;
- GRANTED as to Plaintiffs' fifth claim under section 504 of the Rehabilitation Act;
- DENIED as to Plaintiffs Fobes, Anderson, and Bryan Yost's sixth claim under Cal. Gov. Code § 11135;
- GRANTED as to Plaintiffs' seventh claim under the Bane Act;
- DENIED as to Individual Plaintiffs' eighth claim under Cal. Civ. Code § 2080.

**IT IS SO ORDERED.**

DATED:  December 10, 2025



HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE